[Civ. No. 22687. First Dist., Div. Two. Sept. 21, 1966.]

G. E. CAREY et al., Plaintiffs and Respondents, v. WILLIAM B. CUSACK et al., Defendants and Appellants.

Paul N. McCloskey, Jr., T. C. Carlstrom, and McCloskey, Wilson, Mosher & Martin for Defendants and Appellants.

Crist, Peters, Donegan & Brenner and John M. Brenner for Plaintiffs and Respondents.

TAYLOR, J.—Plaintiffs, G. E. Carey and C. J. Keenan, real estate brokers (hereafter brokers) recovered in quantum

meruit for services rendered in subdividing certain property owned by defendants, William B. and Eileen M. Cusack (hereafter Cusacks). On this appeal, the Cusacks contend that the trial court erred by: 1) denying their motion to dismiss the complaint as the action was barred by the compulsory counterclaim statute (Code Civ. Proc., § 439) as well as the doctrines of collateral estoppel and res judicata; and 2) allowing the brokers to recover in quantum meruit as the relief was barred by the statute of frauds and inconsistent with the written agreement of the parties.

Although the facts are not disputed and the sufficiency of the evidence not challenged, a detailed chronological exposition is necessary for an understanding of the issues presented. In July 1956, the Cusacks and the Smiths purchased a 62.71 acre parcel of land in Los Altos Hills for $245,000. In November 1956, the Cusacks first met with the brokers who were in partnership under the fictitious name of Cornish & Carey, and subsequently discussed how the Cusack-Smith property could be subdivided and sold to the public. After several months of negotiation, the brokers and the Cusacks, on May 27, 1957, entered into a written agreement for the development of the property. This agreement provided for a dummy corporation, Archway, Incorporated (hereafter Archway), in which the brokers were to be the sole stockholders, as the instrumentality to provide certain tax benefits for the Cusacks and through which the brokers would perform their services. The agreement provided that Archway would purchase the Cusack-Smith property for $420,000. Although the agreement on its face was a sale of undeveloped acreage, it provided for subdivision of the land into lots. The Cusacks knew that Archway had no assets and the purpose of its use in the transaction was to acquire capital gains treatment,[1] even though the price paid to the Cusacks was based on the sale of improved subdivided lots.

The brokers agreed to use their best efforts to carry out all of the terms and conditions of the agreement including all acts necessary for the subdivision of the acreage and the subsequent sale of lots. A separate agreement contemporaneously executed provided that the brokers should have no personal liability in connection with carrying out the agreement and

[1]Archway was not to make any profit on the lot sales and thus would have no income. The Cusacks and Smiths were not to receive any money until the lots were sold and then could treat the amount received as a long-term capital gain.

that their sole responsibility as stockholders was to use reasonable efforts to cause Archway and its officers to perform its obligations under the subdivision agreement. The price to Archway was computed by determining the expected proceeds of the sales of the lots and deducting all of the costs of subdivision and off-side improvements together with an amount estimated at $64,000, the commission to be retained by Archway. This latter amount was understood to be compensation to Archway and thereby to the brokers for all of their services under the agreement. The brokers intended to have the actual sale of individual lots handled by their partnership. The purchase price was to be paid by delivery of Archway's promissory notes to the Smiths and Cusacks, both notes secured by deeds of trust on the property. The agreement further provided that the first payment by Archway of 25 percent of the purchase price was to be made on December 31, 1957, and that time was of the essence. The agreement was silent as to what compensation, if any, would be due to the brokers if the transaction did not proceed to the sale of improved subdivided lots.

After the execution of the May 27, 1957 agreement, the brokers, through Archway, hired an engineer, George S. Nolte (hereafter Nolte), to survey the property and prepare subdivision plans. The brokers then devoted a substantial part of their time for approximately 12 months to the subdivision of the Cusack-Smith property. All necessary steps for the subdivision of the property were completed except the recording of the final subdivision map as the Cusacks and Smiths never deeded the total acreage to Archway as called for in the written agreement.

When it became apparent that they would be unable to effect the subdivision of the property in time to make the first payment on December 31, 1957, as required by the agreement, the brokers wrote to the Cusacks and requested an extension. Although the parties could not agree on the terms of the extension, the brokers continued to work on the subdivision of the property. During the period of these negotiations, the Cusacks urged the brokers to complete the subdivision and start selling lots.

Around March 1958, the county adopted a tentative freeway route that cut through one or two lots on the corner of the subdivision and otherwise affected the marketability of some of the lots but did not make the subdivision project unfeasible. After learning of the freeway route, the brokers continued to

work on the subdivision and by May of 1958 had obtained the necessary financing. Archway had the necessary subdivision bond and the subdivision map ready to record on obtaining the signatures of the Smiths. On May 25, 1958, the brokers wrote the Cusacks asking that the revised agreement be executed, the deed deposited, and stating that they were ready to start selling lots. The Cusacks knew that the brokers were working to subdivide the land, did not want them to stop, and did not tell them to stop. The revised agreement drafted by the Cusacks' attorney in final form was never signed; no deeds ever deposited by the Cusacks or Smiths; and no subdivision map signed. After the Cusacks indicated they were not going through with the deal, the brokers stopped working on the subdivision in the latter part of June.

Subsequently, the Cusacks, through another broker, submitted the land as a potential site for the Foothill Junior College and were advised in September 1958 that the college would buy the property for a negotiated condemnation price of $580,000, which was $160,000 more than the $420,000 purchase price provided in the May 1957 agreement.

In July 1958, Nolte filed suit against Archway, the Cusacks, and the Smiths[2] for his engineering services rendered in connection with the subdivision. Nolte's action sought to establish an indebtedness from all defendants as a lien against the property. The Cusacks filed an answer and amended cross-complaints against Archway and the brokers in which the first cause of action sought declaratory relief under the agreement of May 27, 1957, alleging that the brokers were liable for Nolte's engineering services, and the second cause of action sought subrogation against the brokers in the event the Cusacks were required to pay Nolte. A third cause of action was directed against the brokers' partnership on the same grounds. The brokers answered, the matter was tried in January 1959, and the judgment entered in favor of Nolte against the Cusacks and Archway. The court found that the brokers were not individually liable to Nolte as his employment by Archway and the performance of his engineering services were with the knowledge of the Cusacks. This aspect of the judgment was not challenged by the Cusacks in their appeal of the Nolte action and the judgment was affirmed in 1961 by this court (Division One) on appeal on grounds not pertinent here

[2]The Smiths were named as defendants in the Nolte action but were out of state and never served.

(*Nolte* v. *Smith,* 189 Cal.App.2d 140 [11 Cal.Rptr. 261, 87 A.L.R.2d 996]).[3]

In April 1959, about two months after the entry of judgment in the Nolte action, the brokers filed the instant complaint against the Cusacks alleging two causes of action: the first, based on the written agreement of May 27, 1957, for $64,449 (representing $63,000 for their services and $1,449 for costs expended) pursuant to the contract; the second, on an implied contract for payment of the same services and costs expended in the identical amount. At the trial of this action in 1964, the brokers testified that they had performed services, the total value of $22,600, of which about half had been performed under the written agreement prior to December 31, 1957, and the remainder performed thereafter.

The court found that the pending highway condemnation made the development and sale of the property as originally contemplated virtually impossible; that circumstances beyond the control of the parties had delayed the subdivision of the property and the intended sale of the lots, and that as a result of the actual or threatened condemnation proceedings by the Foothill Junior College District, the completion of the May 27, 1957 agreement became impossible. The court further found that after it became apparent that Archway could not make the first payment by December 1957, the parties discussed revising the written agreement and the brokers continued their efforts toward completing the subdivision; and that in the Nolte action, the court did not decide any of the material issues raised in the instant case and that the brokers did not and were not required to file a cross-complaint or counterclaim against the Cusacks.

The court concluded that the brokers were not entitled to recover under the written agreement of May 27, 1957, as full performance of that agreement was impossible, and the agreement did not cover the circumstances that actually occurred; that the present action was not barred by the compulsory counterclaim statute (Code Civ. Proc., § 439); that the statute of frauds was not applicable to the present action and that, therefore, the brokers were entitled to recover in quantum meruit a total of $24,049 for the reasonable value of their

---

[3]The matter was determined on the only issue raised by the Cusacks in the prior appeal, namely, whether Nolte's services were used in a work of improvement that materially increased the value of the real property within the mechanics' lien statutes (Code Civ. Proc., § 1181 et seq.).

services ($22,600) and moneys expended ($1,449), and entered judgment accordingly. This appeal ensued.

The major contention on appeal is that the trial court erred in denying the Cusacks' motion to dismiss the complaint in the instant action as the complaint was barred by the compulsory counterclaim statute (Code Civ. Proc., § 439). The pertinent sections of the statutes are set forth in the footnote.[4]

Section 439 bars a subsequent action only when the counterclaim meets the two essential elements set forth in section 438, and arises from the same transaction set forth in the complaint (*Black* v. *Dillon,* 213 Cal.App.2d 295, 296 [28 Cal.Rptr. 678]; *Zainudin* v. *Meizel,* 119 Cal.App.2d 265 [259 P.2d 460]; 2 Chadbourn, Cal. Pleading, § 1687, p. 653; 2 Witkin, Cal. Procedure (1954) § 585, pp. 1595-1596).

The Cusacks first argue that, despite the clear language of section 438 that the counterclaim *must exist in favor of a defendant and against a plaintiff,* the statute should be applied to a cross-defendant and cross-complainant so that the brokers' failure to plead their claim for subdivision services in their answer to the Cusacks' cross-complaint in the Nolte action, forever barred the brokers' claim. The brokers argue that the statute cannot be so interpreted and that their claim for subdivision services did not exist in their favor against Nolte but only against the Cusacks. The parties are agreed that this question has never been determined by an appellate court of this state. There is some dicta in *Great Western Furniture Co.* v. *Porter Corp.,* 238 Cal.App.2d 502, at p. 513 [48 Cal.Rptr. 76], indicating the availability of a counterclaim as a responsive pleading to a cross-complaint. However, most authorities agree that while a cross-complaint may be directed against a codefendant or bring in new parties, the counterclaim must be against a plaintiff (2 Witkin, Cal. Procedure (1954) § 567, pp. 1571-1572, and § 579, pp. 1589-1590) and may not be used to bring in third parties or seek relief against a codefendant (2 Chadbourn, Cal. Pleading (1961 ed.) § 1684,

[4]Code of Civil Procedure section 438, so far as pertinent provides: ''The counterclaim . . . must tend to diminish or defeat the plaintiff's recovery and must exist in favor of a defendant and against a plaintiff between whom a several judgment might be had in the action; . . .''

Code of Civil Procedure section 439: ''If the defendant omits to set up a counterclaim upon a cause arising out of the transaction set forth in the complaint as the foundation of the plaintiff's claim, neither he nor his assignee can afterwards maintain an action against the plaintiff therefor.''

p. 649; *LaSala* v. *Ferrara*, 202 Cal.App.2d 399 [20 Cal.Rptr. 761]).[5]

The Cusacks argue that logically the word "complaint" in section 439 should be read to include a cross-complaint. They rely on the modern approach to pleading and rule 13 of the Federal Rules to argue that we should eliminate one of the well-established and well-recognized differences between counterclaims and cross-complaints in California procedure. While our courts have frequently pointed out that the line of distinction between cross-complaints and counterclaims is often shadowy and there is a considerable amount of overlap (*Wettstein* v. *Cameto*, 61 Cal.2d 838, 841 [40 Cal.Rptr. 705, 395 P.2d 665]; *Taliaferro* v. *Taliaferro*, 154 Cal.App.2d 495, 498 [316 P.2d 393]), as indicated above, all of the authorities agree that as to joinder, the distinction is clear.

The Legislature apparently wished to perpetuate this distinction. In 1957, when it liberalized the joinder provisions of the cross-complaint statute (Code Civ. Proc., § 442), it did not similarly amend the counterclaim statute although the Law Revision Commission had recommended that section 442 remain unchanged until a full study could be made of the problems of joinder with respect to counterclaims as well as cross-complaints (see Friedenthal, *Expansion of Joinder*, 51 Cal.L.Rev. 494, for an excellent discussion of the problems presented).

However, we need not here resolve the controversy concerning this distinction between cross-complaints and counterclaims in order to dispose of the case before us, as the instant action does not meet the "same transaction" requirement of section 439. While section 438 does not require a subject matter relationship between the claims asserted in the complaint and counterclaim, section 439 bars only those counterclaims that arise out of the same transaction (*Saunders*

---

[5]Ferrara attempted to intervene in an action by LaSala against Peerless Insurance. Ferrara had previously sued LaSala and obtained an attachment bond from Peerless. Ferrara lost to LaSala, and LaSala sued Peerless to recover damages on the attachment bond. In the prior action, Ferrara also had sued Poole, and recovered judgment against Poole. LaSala owed money to Poole. Ferrara attempted to intervene in LaSala's action against Peerless and have LaSala's debt to Poole subjected to payment of Ferrara's judgment against Poole. The suit in intervention was not allowed, the court holding at page 401: "It is clear that neither intervener nor the surety Peerless has any setoff or counterclaim against plaintiff LaSala. Under section 438, Code of Civil Procedure, a counterclaim must be a claim in favor of defendant and against plaintiff."

v. *New Capital For Small Businesses, Inc.,* 231 Cal.App.2d 324 [41 Cal.Rptr. 703]).

The purpose of section 439 is to provide for the settlement in a single action of all conflicting claims between the parties arising out of the same transaction and thus avoid multiplicity of actions and judgments. To achieve this purpose, the statute has been liberally construed. The term "transaction" is not limited to a single, isolated act or occurrence, but may embrace a series of acts or occurrences logically interrelated (*Saunders* v. *New Capital For Small Businesses, Inc., supra,* pp. 334-336).

In *Saunders,* the plaintiff brought an action in quantum meruit for services rendered to the defendant corporation, which had previously brought an action against the plaintiff to recover money allegedly taken by him in breach of his fiduciary obligations as director and general counsel. The plaintiff failed to assert a counterclaim in the prior action and this court (Division One) held that the two claims arose out of the same transaction, namely, *the continuous, subsisting relationship between the plaintiff and the corporation.*

Applying the same test to the instant case, the brokers' action against the Cusacks cannot be held to come out of the same relationship as the Nolte action. The Nolte action was based on the agreement between Nolte and Archway. It is contended that the 1957 agreement between the brokers and the Cusacks, as pleaded in the Nolte action, was the common underlying factor in both the Nolte action and in this one. However, it does not follow that the statute, therefore, bars the brokers' claim in the instant case. Such a holding would bring too many unrelated issues into this case or any case involving a sizeable enterprise. The dealings between Archway and Nolte and the agreement between the Cusacks and the brokers were based on two separate and distinct transactions and are devoid of any logical interrelation (*Black* v. *Dillon,* 213 Cal.App.2d 295, 296 [28 Cal.Rptr. 678]; *Posz* v. *Burchell,* 209 Cal.App.2d 324 at p. 329 [25 Cal.Rptr. 896]).

It has been held that even where the same parties are involved, the requirements of the statute are not necessarily met. In *Posz* v. *Burchell, supra,* the court held that a grower's action against a nursery for negligence in storing and delivering a damaged stock of plants in 1954 was not barred by his failure to counterclaim in the nursery's prior action against him to recover the balance due on stock sold to him by the nursery in 1955. The court held (at p. 339) that the two claims

were separate transactions within the meaning of section 439 of the Code of Civil Procedure.

 Our view is consistent with the rule that the "several judgment" test of section 438 is not satisfied unless the defendant's claims are asserted by him in the same capacity in which his obligations to the plaintiffs arose (*Clark* v. *Lesher*, 46 Cal.2d 874 [299 P.2d 865]). Thus, a fiduciary cannot set off claims owed him in his personal capacity against obligations he assumed in his fiduciary capacity (*Garrison* v. *Edward Brown & Sons*, 25 Cal.2d 473, 477 [154 P.2d 377]).

 The instant action fails to meet the other requirements of section 438. It does not tend to defeat or diminish the recovery sought by the Cusacks against the brokers in the Nolte action. In that action, there were no monetary claims made by the Cusacks against the brokers. In one cause of action, the Cusacks' cross-complaint merely asked for a declaratory judgment holding Archway and the brokers liable for Nolte's services. In their other causes of action based on the right of subrogation, the Cusacks could have made no direct monetary recovery from the brokers unless and until they first paid Nolte the amount owed (*Iusi* v. *City Title Ins. Co.*, 213 Cal. App.2d 582, 587-588 [28 Cal.Rptr. 893]). They were not demanding a monetary damage award but were, in effect, simply asking the court to declare that someone else was liable for Nolte's services.[6]

Furthermore, in the Nolte action, the trial court found that only the Cusacks and Archway were liable to Nolte; that Archway was not the *alter ego* of the brokers, and that the written contract relieved the brokers of any personal monetary liability. Thus, there was never any liability, direct or indirect, on the part of the brokers or their partnership against which they could set off their claim for the value of their subdivision services rendered to the Cusacks. We note that the Cusacks did not challenge any of these findings in the prior appeal. We conclude that the trial court properly held that this action was not barred by Code of Civil Procedure section 439.

The Cusacks further argue that, independent of the statute,

---

[6]We have read and considered *Rothtrock* v. *Ohio Farmers Ins. Co.*, 233 Cal.App.2d 616 [43 Cal.Rptr. 716], and *Padula* v. *Superior Court*, 235 Cal. App.2d 567 [45 Cal.Rptr. 500], cited by appellants in oral argument, and consider them not in point as in both cases the adverse claims clearly arose out of the same transactions and a diminution in the monetary recovery of the plaintiffs would have resulted from successful counterclaims.

this action is barred by the doctrines of collateral estoppel and res judicata. They cite *Mitchell* v. *Jones,* 172 Cal.App.2d 580, 584-585 [342 P.2d 503], and *Sutphin* v. *Speik,* 15 Cal.2d 195 [99 P.2d 652, 101 P.2d 407], to argue that the doctrine of collateral estoppel applies as the matter could have been raised in the prior action. ▆ The correct rule, however, is that estoppel results only on issues actually litigated (3 Witkin, Cal. Procedure (1954) p. 1948; *Clark* v. *Lesher,* 46 Cal.2d 874, 880-881 [299 P.2d 865]). ▆ As the question of whether or not the Cusacks were obligated to pay the brokers for their services in subdividing the property was neither raised nor determined in the Nolte action, the arguments based on collateral estoppel and res judicata are untenable.

We turn briefly to the second major contention which concerns the merits of the appeal. The Cusacks argue that the trial court erred in concluding that the statute of frauds did not apply and that the brokers were entitled to recover for the reasonable value of services rendered and moneys expended in the subdivision of the Cusacks' property. As previously indicated, the sufficiency of the evidence is not challenged. There is no question that the evidence fully supports the findings and judgment. Mr. Cusack admitted that the brokers had performed subdivision services and had not been paid. After December 1957, when it became apparent that the agreement could not be performed, the brokers rendered various services and were urged by the Cusacks to proceed with the subdivision as rapidly as possible. By the spring of 1958, the brokers had completed all necessary steps for the subdivision except final approval by the Town Council of Los Altos Hills which required the transfer of the property to Archway. The property was never deeded to Archway as required in the written agreement. In June 1958, the Cusacks indicated that they did not intend to perform and submitted the property to the junior college district through another broker. In September 1958, they were informed that the junior college district would buy for a negotiated condemnation price of $580,000 the same property offered to Archway for $420,000 in 1957 and acquired in 1956 for $245,000. The expert evidence adduced at the trial indicated that the increase in value on unimproved property in the area was 3 to 4 percent a year. ▆ After the junior college district condemned the property, the Cusacks' obligation was excused by impossibility (*Ogren* v. *Inner Harbor Land Co.,* 83 Cal.App. 197 [256 P. 607]; Rest., Contracts, § 468, subd. (2)).

■ The Cusacks contend that the only recovery that the brokers can have for their services is under the written agreement of May 1957, and that since the brokers failed to perform by December 31, 1957, the conditions precedent to their compensation never occurred. They rely on *Beazell* v. *Schrader*, 59 Cal.2d 577, 581-582 [30 Cal. 534, 381 P.2d 390], and similar cases, holding that the brokers can recover commissions only on the basis of a written agreement, and argue that since the agreement was silent concerning the compensation of the brokers if the subdivision transaction did not proceed to completion, there is no basis for recovery in quantum meruit. This contention is entirely without merit. The brokers here sought to recover not the amount of the commission under the original contract but restitution for the reasonable value of their subdivision services benefiting the Cusacks' property.

■ Where services are rendered by one party from which another derives benefit, the law presumes an obligation to pay the reasonable value thereof (*Meredith* v. *Marks,* 212 Cal.App. 2d 265 [27 Cal.Rptr. 737]). ■ Where services are performed for a consideration which turns out to be impossible of performance, the reasonable value of the services may be recovered (*McGillycuddy* v. *Los Verjels Land etc. Co.,* 213 Cal. 145 [2 P.2d 19] ; Civ. Code, § 1613).

■ The trial court properly concluded that the statute of frauds (§ 1624, subd. 5 of the Civ. Code) was not applicable. In the first place, the recovery given was for subdivision services and not for the commission for *the sale* of the property. In the second place, the purpose of the statute is to show the fact of employment and thereby prevent false claims by agents not authorized to act. Once the fact of employment is established by a writing, parol evidence may be used to show the value of the services rendered (*Davinroy* v. *Thompson,* 169 Cal.App.2d 63 at p. 65 [336 P.2d 1028] ; *Lathrup* v. *Gauger,* 127 Cal.App.2d 754 [274 P.2d 730]). In the instant case, the fact of the brokers' employment was established by the written agreement.

It ill becomes the Cusacks to argue that the brokers can only recover under an agreement that the Cusacks are excused from performing. ■ The uncontroverted facts are that within 2½ years after purchasing the property for $245,000 and within one year after agreeing to sell the property to Archway for $420,000, the Cusacks were able to negotiate a price of $580,000 from the condemning authorities. Since the increase in value far exceeded the 3 to 4 percent general increase of

land values in the area, the trial court reasonably inferred that the negotiated price of the junior college was based on the property as subdivided, and properly concluded that it would be unconscionable to allow the Cusacks to retain the benefit of the brokers' subdivision services without making restitution for them.

The judgment is affirmed.

Shoemaker, P. J., and Agee, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 16, 1966.