[L.A. No. 32034. Oct. 29, 1987.]

DAVID E. PHILLIPPE, Plaintiff and Appellant, v.
SHAPELL INDUSTRIES, INC., Defendant and Appellant.

COUNSEL

Fleischman & Rigdon and Robert N. Rigdon for Plaintiff and Appellant.

Cox, Castle & Nicholson and Kenneth B. Bley for Defendant and Appellant.

William M. Pfeiffer, Stephen A. Groome and Steven A. Sokol as Amici Curiae.

## OPINION

**EAGLESON, J.**—A jury found in favor of plaintiff, a licensed real estate broker, in his action to recover a broker's commission from defendant, a real property buyer. Defendant appeals. The primary issue before us is whether a licensed real estate broker may assert equitable estoppel against a statute of frauds defense in an action by the broker to recover a real estate commission.

We conclude that a licensed real estate broker cannot invoke equitable estoppel to avoid the statute of frauds unless the broker shows actual fraud. To decide otherwise would be contrary to nearly unanimous precedent spanning several decades and to the purpose of the statute of frauds. The trial court's judgment in favor of plaintiff is reversed with directions to enter judgment in favor of defendant.

## FACTS

Viewed on appeal in a light most favorable to plaintiff David E. Phillippe (hereafter Phillippe) the evidence establishes the following: Phillippe is a real estate broker licensed for 20 years by the State of California. Defendant Shapell Industries, Inc. (hereafter Shapell) is a corporation engaged in the construction of residential housing tracts and periodically purchases land for such construction. Shapell is also a licensed California real estate broker.

Phillippe was first contacted by Shapell in early 1972 in connection with its efforts to acquire a 78-acre parcel of land in the San Diego area. Phillippe was the listing agent for the landowner. Shapell purchased the property in December 1972 and paid Phillippe $153,100 for his services as a broker.

In January 1973, Prince, then Shapell's director of land acquisition, contacted Phillippe to determine if he would be willing to work with Shapell on additional land acquisitions. They orally agreed that Phillippe would assist Shapell in finding suitable land in the Palos Verdes Peninsula area in Southern California. Phillippe explained to Prince that Phillippe then had no

listings in that area and that, if he were to assist Shapell, his commission would have to be paid by Shapell as the buyer. Prince, on behalf of Shapell, orally promised Phillippe that Shapell would pay him a broker's commission for any land submitted by Phillippe and purchased by Shapell and that this commission would be stated in any written offer made by Shapell to a seller.

Phillippe wrote to Prince on April 5, 1973, about a parcel of land owned by the Filiorum Corporation. Phillippe stated that he was "waiting for a price quote on the property" and suggested that Prince take a look at it. He also stated in this letter: "We present the property to Shapell with the understanding that Buyer will pay our firm a commission, which, when added to the net price of the land, will equal 6% of the total consideration."

By letter from Prince dated May 4, 1973, Shapell submitted to Phillippe an offer to purchase the Filiorum property and stated that "Buyer agrees to pay the Management Trend Company [Phillippe's firm] a commission [which] when added to the net price of the land will equal 6% of the total consideration. This commission should be paid at the close of escrow." The sale of the Filiorum property was not consummated due to geological problems. No commission was paid to Phillippe.

On August 9, 1973, Phillippe again wrote to Prince, this time informing Shapell of the locations and owners of 4 properties on the Palos Verdes Peninsula including a 94-acre parcel owned by Great Lakes Properties, Inc. (hereafter the Great Lakes property). Phillippe also stated in this letter that "[i]n the event properties are purchased from any of the above companies, these properties are presented with the understanding that Buyer agrees to pay Management Trend Company, or assignee, a commission which when added to the net purchase price of the land will equal 6% of the total consideration to be paid at close of escrow." Shapell did not respond in writing to Phillippe's letter. Shapell did not purchase the Great Lakes property at that time because the zoning of the property was too restrictive for Shapell's construction purposes.

Throughout late 1973 and early 1974, Phillippe continued to try to bring about a sale of the Great Lakes property to Shapell. He discussed a sale with the owner of the Great Lakes property. Phillippe suggested a price formula and noted Shapell's financial ability to purchase the property. Phillippe also wrote several letters to Shapell, the last of which was dated April 30, 1974, and was addressed to Joseph Aaron, a Shapell vice president. In this letter, Phillippe reviewed prior negotiations for the Great Lakes property and in connection with commissions stated: "The commission arrange-

ment on these properties between our firm and Shapell is spelled out in the August 9, 1973, letter [to Prince]."

In February 1974, the Great Lakes property was rezoned from one dwelling unit per two acres to two dwelling units per acre. Nothing more happened regarding the Great Lakes property until late 1975 when Aaron telephoned the property owner and learned that 63 acres were still available for sale. Direct negotiations between Shapell and the owner followed, and in March 1976 Shapell signed a purchase and sale agreement for 63 acres. The sale closed on August 27, 1976. The sale price was $2,718,750. Shapell's written purchase offer did not provide for any commission to Phillippe.

When Phillippe learned that Shapell had agreed to buy the Great Lakes property, he wrote to Aaron on June 9, 1976, and requested a commission on the purchase. Phillippe reminded Aaron that Phillippe had agreed to work for Shapell "on the condition and with the understanding that our firm was working for and represented Shapell, the buyer, as brokers and would be paid a brokerage commission from buyer of 6% of the total consideration paid for the acquired property." Phillippe also reviewed his efforts regarding the Great Lakes property.

On June 16, 1976, Aaron responded by letter informing Phillippe that Shapell would not pay him a commission. Aaron claimed that there had been no mutual agreement of representation and that Shapell had been negotiating for the Great Lakes property "prior to and independent of any representations" by Phillippe.

In April 1977, Phillippe filed suit against Shapell to recover a 6 percent broker's commission for the sale of the Great Lakes property and other alleged damages. The case was tried in February 1982 and went to the jury on three theories of recovery. First, Phillippe sought recovery of a 6 percent broker's commission on the basis of either a written agreement of employment, a memorandum of employment sufficient to satisfy the statute of frauds, or an equitable estoppel to preclude Shapell from asserting the statute of frauds as a defense. Second, Phillippe sought a 6 percent finder's fee based on an alleged agreement with Shapell. Third, he sought a 6 percent commission based on an alleged agreement between himself and Shapell as brokers to share a commission.

The jury found by special verdict that Phillippe was the procuring cause of the purchase of the Great Lakes property by Shapell and awarded Phillippe $125,000 on his first theory of recovery but rejected his other two

theories of recovery. The trial court denied Shapell's motion for a new trial and entered judgment in favor of Phillippe.[1]

Shapell appeals on the grounds, inter alia, that Phillippe's claim is barred by Civil Code section 1624, subdivision (d), the subdivision of California's statute of frauds dealing with real estate brokerage commissions, and that Shapell is not estopped from asserting the statute of frauds as a defense. Phillippe cross-appeals on the ground that the jury failed to award him all the damages to which he is entitled.

## DISCUSSION

*The Agreement Between Phillippe and Shapell Is Subject to the Statute of Frauds.*

Civil Code section 1624, subdivision (d) provides that an agreement authorizing or employing an agent, broker, or any other person to purchase or sell real estate is invalid unless the agreement or some note or memorandum of the agreement is in writing and subscribed by the party to be charged or by his agent.[2] ▮▮▮ Phillippe contends Civil Code section 1624(d) does not apply to the agreement between him and Shapell. We disagree.[3]

Phillippe argues that the statute is inapplicable because he was not acting as a broker for the Great Lakes property purchased by Shapell, but only as a "professional consultant in the field of subdivision land acquisition." ▮▮▮ A licensed broker may be able under appropriate circumstances to recover under an oral agreement or in quantum meruit for certain services other than the purchase, sale, or leasing of real property. (*Owen* v. *National Container Corp. of Cal.* (1952) 115 Cal.App.2d 21, 25-26 [251 P.2d 765]; *Carey* v. *Cusak* (1966) 245 Cal.App.2d 57, 69 [54 Cal.Rptr. 244].) ▮▮▮ Phillippe fails to cite, and we are unable to find in the record, any evidence of professional services rendered to Shapell other than those a

---

[1] Phillippe unsuccessfully moved for judgment notwithstanding the verdict as to the two theories of recovery rejected by the jury.

[2] California's original statute of frauds was enacted in 1872. It was amended in 1878 to include real estate broker commission agreements.

Section 1624 now reads in pertinent part: "The following contracts are invalid, unless they, or some note or memorandum thereof, are in writing and subscribed by the party to be charged or by the party's agent: . . . (d) An agreement authorizing or employing an agent, broker, or any other person to purchase or sell real estate . . . or to procure, introduce, or find a purchaser or seller of real estate . . . for compensation or a commission."

When Phillippe began this action, section 1624, subdivision (d) was designated as subdivision (5). The designation was changed in 1985. There was no substantive change in the subdivision. For convenience, we will refer to section 1624, subdivision (d) merely as section 1624(d).

[3] All further statutory references are to the Civil Code unless indicated otherwise.

broker would reasonably be expected to perform in trying to consummate a sale, for example, furnishing Shapell with descriptions of the property. Phillippe's pretrial pleadings contradict his claim that he was a professional consultant. In his first amended complaint, he alleged that, after he located and presented the Great Lakes property to Shapell, it "took over all activities leading to the eventual purchase of the property by Shapell," and that, when a broker was employed by Shapell, the broker "served only as a flunky and assistant to Shapell's employees." Phillippe's services were merely incidental to his efforts to bring about a sale of the property to Shapell. Any agreement to perform those Services is thus subject to section 1624(d). (*Owen* v. *National Container Corp. of Cal., supra,* 115 Cal.App.2d 21, 28; see generally 1 Miller & Starr, Current Law of Cal. Real Estate (1975) § 1.55, pp. 74-75.)

Phillippe's own evidence makes clear that he was acting as a broker. In his April 5, 1973, letter to Prince, Phillippe stated that he was "waiting for a price quote on the property." When Phillippe wrote to Aaron on June 9, 1976, requesting a conmission, Phillippe described his relationship with Shapell and the nature of his services as follows: "Early in 1973 our firm was asked by Ron Prince of Shapell to do an extensive survey of properties available for sale on the Palos Verdes Peninsula. We agreed to do so on the condition and with the understanding that our firm was working for and represented Shapell, the buyer, *as brokers and would be paid a brokerage commission from buyer of 6%* of the total consideration paid for the acquired property." (Italics added.) Phillippe viewed himself as a broker. The nature of his claimed compensation was that of a broker's fee —it was contingent on a sale, and it was in the customary amount charged by brokers. We agree with the observation that, "if an object looks like a duck, walks like a duck and quacks like a duck, it is likely to be a duck." (*In re Deborah C.* (1981) 30 Cal.3d 125, 141 [177 Cal.Rptr. 852, 635 P.2d 446] [conc. opn. of Mosk, J.].) It is clear that Phillippe was acting as a broker.

We view Phillippe's characterization of himself as other than a broker as semantic sleight-of-hand. Phillippe tried this case on the primary theory that he is entitled to a broker's commission. The jury found in Phillippe's favor only on his claim for a broker's commission. He now says he was never acting as a broker. ■ Even if that were so, the general rule is that a party may not for the first time on appeal change his theory of recovery. (*Bogacki* v. *Board of Supervisors* (1971) 5 Cal.3d 771, 780 [97 Cal.Rptr. 657, 489 P.2d 537].)

■ Phillippe also contends section 1624(d) is not applicable to his agreement with Shapell because it is an agreement between brokers. Phillippe's argument on this point is less than clear, but he appears to contend

that the statute of frauds does not apply because either: (1) one of the principals to the transaction, Shapell, is a licensed broker, or (2) the agreement was between brokers to share a commission. Neither point has merit.

■ First, the primary purpose of section 1624(d) is to protect real estate sellers and purchasers from the assertion of false claims by brokers for commissions. (*Pac. etc. Dev. Corp.* v. *Western Pac. R. R. Co.* (1956) 47 Cal.2d 62, 67 [301 P.2d 825].) ■ We perceive no logical reason why a licensed broker or agent who is acting as a seller or purchaser of real property should not be entitled to this protection. Licensees are as subject to false claims as are unlicensed members of the public.[4] Phillippe's argument appears to be that licensed brokers know the requirements of the statute of frauds and thus do not need its protection. His argument is too broad because, if it were accepted, judges, lawyers, and any other group who might reasonably be presumed to know the law, including the statute of frauds, would be stripped of its protection. The fact that Shapell is a licensed broker acting as a principal in the transaction does not render the statute of frauds inapplicable to the agreement with Phillippe. (*Marks* v. *Walter G. McCarty Corp.* (1949) 33 Cal.2d 814, 823 [205 P.2d 1025].)[5]

Second, if Phillippe means the statute does not apply because there was an agreement with Shapell to share a broker's commission, we reject that argument as well. Shapell was acting as a principal, not as a broker. The jury found by special verdict that there was no valid agreement between Phillippe and Shapell to share a broker's commission. Substantial evidence supports that finding. It must not be disturbed on appeal. (*Jessup Farms* v. *Baldwin* (1983) 33 Cal.3d 639, 660 [190 Cal.Rptr. 355, 660 P.2d 813].) Thus, we need not decide whether such commission-sharing agreements are within the ambit of section 1624(d), but we note that the Courts of Appeal have found that such agreements are not subject to the statute. (See, e.g., *Iusi* v. *Chase* (1959) 169 Cal.App.2d 83, 86 [337 P.2d 79]; *Holland* v. *Morgan & Peacock Properties* (1959) 168 Cal.App.2d 206, 210 [335 P.2d 769].)

---

[4] Approximately one person in every fifty in California holds a real estate license. (L. A. Times (Apr. 20, 1980) pt. IX, at p. 1, as noted in Federal Trade Com. Staff Rep., The Residential Real Estate Brokerage Industry (Dec. 1983) vol. 1, p. 91.) To decide that licensees acting as principals are not subject to the statute would deprive a significant portion of the state's populace of the statute's protection.

[5] The plaintiff broker in *Marks* did not argue that the statute was inapplicable, but the court found his agreement invalid under the statute even though the defendant seller was also a licensed broker.

■ ■■■ ■■ In light of the foregoing, we hold that the agreement between Shapell and Phillippe is subject to the requirements of section 1624(d).[6]

*The Agreement Between Shapell and Phillippe Does Not Meet the Requirements of Section 1624.*

■■ A broker's real estate commission agreement is invalid under section 1624(d) unless the agreement "or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by the party's agent." The writing must unequivocally show on its face the fact of employment of the broker seeking to recover a real estate commission. (*Franklin* v. *Hansen* (1963) 59 Cal.2d 570, 573 [30 Cal.Rptr. 530, 381 P.2d 386]; *Pac. etc. Dev. Corp.* v. *Western Pac. R. R. Co., supra,* 47 Cal.2d 62, 68.) ■■ To satisfy this requirement, Phillippe relies on the considerable correspondence between Shapell and himself. ■■ "It is for the court to determine whether letters which have passed between parties constitute an agreement between them." (*Wristen* v. *Bowles* (1889) 82 Cal. 84, 87 [22 P. 1136]; *Niles* v. *Hancock* (1903) 140 Cal. 157, 163 [73 P. 840].) We have carefully reviewed the record. ■■ We find no written agreement or memorandum sufficient to comply with section 1624(d).[7]

The only writings that relate to a commission on the Great Lakes property are from Phillippe to Shapell. There is no evidence of a writing signed by Shapell showing the fact of Phillippe's employment to act as a broker for Shapell as to the Great Lakes property. There is only one letter in the exchange of correspondence referring to Phillippe's employment that is signed by Shapell. That is the letter of May 4, 1973, from Prince, Shapell's director of land acquisition, to Phillippe in which Shapell offered to buy the

---

[6]Phillippe also sought recovery on the theory that he had served as a mere finder rather than as a broker, and that Shapell had agreed to pay a finder's fee. Phillippe contended that finders' fee agreements are not subject to section 1624(d). By special verdict, the jury found there was no finder's agreement. Phillippe does not appeal that determination. Even if there had been such an agreement, it would not benefit Phillippe, because finders' agreements, like brokers' commission agreements, are subject to section 1624(d). (*Tenzer* v. *Superscope, Inc.* (1985) 39 Cal.3d 18, 25-27 [216 Cal.Rptr. 130, 702 P.2d 212].)

[7]Even if the existence of a written agreement were for the jury to decide, the jury made that decision in this case. The jury found by special verdict that Shapell entered into a "valid agreement to pay a real estate broker's commission" to Phillippe. The jury instructions, however, would have allowed the jury to so find based either on the ground that the "commission agreement was in writing or that all the elements existed for legally excusing the writing requirements." The record reflects that the only possible basis for the jury's finding was that there was an estoppel. At the hearing on Shapell's motion for new trial, the court noted that "we obviously didn't have a broker's commission in writing, and so it [the special verdict] had to be under the instruction about estoppel." We agree and construe the special verdict to be that there was no written agreement.

Filiorum property. Prince stated: "Buyer [Shapell] agrees to pay the Management Trend Company [Phillippe's firm] a commission [which] when added to the net price of the land will equal 6% of the total consideration. This commission should be paid at the close of escrow." As noted earlier, this sale was never consummated due to geology problems.

■ Where a broker's only agreement with his principal relates solely to specifically described property, the principal is not liable to the broker for a commission on the purchase of different property unless the broker's written employment agreement covers the other property. (*Frederick* v. *Curtright* (1955) 137 Cal.App.2d 610, 614 [290 P.2d 875].) ■ The only writing signed by Shapell referred to the Filiorum property, not to the Great Lakes property, and is not sufficient under section 1624(d) to cover the Great Lakes property.

A writing signed by Shapell is not all that is lacking. The alleged oral commission agreement entered into in January 1973 was devoid of specifics. For example, there was no agreement as to the price range of properties that Phillippe would present to Shapell. There was no agreement as to geographic location other than the possible limitation to the Palos Verdes Peninsula, an area so large and loosely defined as to be almost meaningless. Nor was there any time specified within which Phillippe was to present the properties. We need not decide whether the absence of one or more such specifics would be fatal to the alleged agreement. The total lack of meaningful terms and conditions is the problem. Under the oral agreement, Shapell could have been charged with a commission for any property presented at any time by Phillippe. Such open-ended liability is unacceptable.

We hold there was no writing sufficient under the statute of frauds.

*The Doctrine of Equitable Estoppel Does Not Prohibit Shapell From Asserting the Statute of Frauds as a Defense.*

■ Phillippe argues that Shapell should be estopped from asserting the statute of frauds as a defense even if the agreement between them was oral and thus invalid under the statute. Phillippe contends estoppel is proper because he changed his position by performing services in reliance on Shapell's oral promise to pay a commission on the Great Lakes property. Phillippe correctly cites *Monaco* v. *Lo Greco* (1950) 35 Cal.2d 621 [220 P.2d 737] for the proposition that estoppel is proper to avoid unconscionable injury or unjust enrichment that would result from refusal to enforce an oral promise. The principle set forth in *Monaco* does not, however, support the application of equitable estoppel in the present case.

The Courts of Appeal have consistently held, with two narrow exceptions not present here, that a licensed broker may not assert estoppel against a statute of frauds defense in an action to recover a commission under an oral employment agreement. (See, e.g., *Deeter* v. *Angus* (1986) 179 Cal.App.3d 241, 248 [224 Cal.Rptr. 801]; *Augustine* v. *Trucco* (1954) 124 Cal.App.2d 229, 237-238 [268 P.2d 780].)[8] This court has also repeatedly denied the availability of estoppel and other equitable remedies to licensed brokers in such actions. In *Tenzer* v. *Superscope, Inc., supra,* 39 Cal.3d 18, which did not involve a licensed broker, we noted that the rules withholding traditional equitable remedies, including the doctrine of estoppel, from licensed real estate brokers have been vigorously criticized, but we reserved for later decision the question whether licensed brokers may invoke equitable remedies to avoid the sometimes harsh results of the statute of frauds. (*Id.,* at p. 28, fn. 6.) We now answer that question.[9]

We held in *Tenzer* that an *unlicensed real estate finder* was entitled to invoke the doctrine of equitable estoppel against a statute of frauds defense in his action to recover a commission under an oral finder's fee agreement. (*Id.,* at p. 28.) Because real estate brokers must be licensed to conduct business (Bus. & Prof. Code, § 10130), almost all actions to recover commissions will be by licensed brokers, not by unlicensed finders. Thus, *Tenzer* stated a very narrow exception to section 1624(d) that will not significantly thwart the purpose of that section. To extend the *Tenzer* exception to licensed brokers would significantly undermine section 1624(d).

In allowing equitable estoppel in *Tenzer,* we carefully distinguished between *unlicensed* finders and *licensed* brokers. "The rationale for the rigorous application of the statute of frauds to bar claims by licensed real estate brokers is related to the statutory licensing requirements. 'Real estate brokers are licensed as such only after they have demonstrated a knowledge of the laws relating to real estate transactions (Bus. & Prof. Code, §§ 10150, 10153), and it would seem that they would thus require less protection against pitfalls encountered in transactions regulated by those laws. In

---

[8] The two circumstances where the Courts of Appeal have applied equitable estoppel are: (1) where the real estate broker cancelled an otherwise valid written contract with the sellers of the property in reliance on the buyer's oral promise that he would pay the broker's commission (*Le Blond* v. *Wolfe* (1948) 83 Cal.App.2d 282, 287 [188 P.2d 278]), and (2) where the broker's principal has represented to the broker that his authorization was in writing when in fact it was not. (*Owens* v. *Foundation for Ocean Research* (1980) 107 Cal.App.3d 179, 183 [165 Cal.Rptr. 571 ] [disapproved on other grounds in *Tenzer* v. *Superscope, Inc., supra,* 39 Cal.3d 18, 29].) Neither circumstance is present in the instant case.

[9] For criticism of the courts' reluctance to extend equitable remedies to brokers see Comment, *Equitable Estoppel and the Statute of Frauds in California* (1965) 53 Cal.L.Rev. 590, 602, 609; Note, *Oral Employment Contracts and Equitable Estoppel: The Real Estate Broker as Victim* (1975) 26 Hastings L.J. 1503; 1 Miller & Starr, Current Law of California Real Estate, *supra,* section 1.54, pages 69-74, footnote 8.

*Pacific Southwest Dev. Corp.* v. *Western Pac. R. R. Co.* [1956] 47 Cal.2d 62 [301 P.2d 825], the court stated at page 70: "Plaintiff is a licensed real estate broker and, as such, is presumed to know that contracted for real estate commissions are invalid and unenforceable unless put in writing and subscribed by the person to be charged. [Citations.] Nevertheless, plaintiff failed to secure proper written authorization to protect itself in the transaction. Rather it assumed the risk of relying upon claimed oral promises of defendant, and it has no cause for complaint if its efforts go unrewarded."'" (39 Cal.3d at pp. 27-28, quoting *Franklin* v. *Hansen* (1963) 59 Cal.2d 570, 575 [30 Cal.Rptr. 530, 381 P.2d 386].)

The courts have long had little sympathy for the broker who fails to adhere to the statute of frauds. In *Marks* v. *Walter G. McCarty Corp., supra,* 33 Cal.2d 814, the plaintiff broker had dealt for several months with the owner of a hotel without obtaining a signed employment agreement. The hotel was eventually sold as a result of the broker's efforts, but he was not paid a commission. This court accepted the trial court's findings that the defendant had promised to pay the broker a commission and that the broker was the procuring cause of the sale, but decided that the broker was not entitled to recover a commission because his agreement did not comply with the statute of frauds. "The plaintiff, a man of experience in this line of business, knew how to protect himself in the transaction but failed to do so." (*Id.,* at p. 823.)

We believe the distinction between licensed brokers and unlicensed finders remains valid. We are not alone. Many "courts distinguish between persons in the traditional categories [of the statute of frauds] and brokers, who are assumed to be familiar with the laws governing their occupation." (Rest.2d Contracts (1981) § 126, reporter's note, p. 317.) An applicant for a broker's license must demonstrate by written examination that he or she has an understanding of "the general purposes and general legal effect of agency contracts." (Bus. & Prof. Code, § 10153.) To obtain an original broker's license, an applicant must have been a licensed and actively employed real estate salesperson for at least two years. (Bus. & Prof. Code, § 10150.6.) The Legislature has recently increased the educational requirements to obtain a broker's license to include mandatory successful completion at an accredited institution of a course in the legal aspects of real estate. (Bus. & Prof. Code, § 10153.2, subd. (a).) To renew their licenses, brokers must now successfully complete continuing professional education courses including legal study. (Bus. & Prof. Code, § 10170.5.)[10] The requirements that li-

---

[10]The legal study requirements are substantial. Business and Professions Code section 10170.5 provides that the continuing education must include: "A three-hour course in ethics, professional conduct, and *legal* aspects of real estate, which shall include, but not be limited

censed brokers know the law is stronger than ever before. Licensed brokers are conclusively presumed to know the requirements of section 1624(d).

What is the effect of this presumed knowledge? In *Monarco* v. *Lo Greco, supra,* 35 Cal.2d 621, 623, the court observed that estoppel can be applied "to prevent fraud." The court explained that it was not speaking of actual fraud but of the "fraud" that inheres in situations where there is an unconscionable injury to the promisee under an invalid oral contract or unjust enrichment to the promisor. (*Ibid.*; see generally 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 325, p. 305.)

In *Pacific Southwest, supra,* 47 Cal.2d 62, decided after *Monarco,* the court held that a licensed real estate broker seeking to recover a commission under an oral agreement could not assert equitable estoppel to avoid the statute of frauds. The court addressed both factors set forth in *Monarco*—unconscionable injury and unjust enrichment. The court determined that the mere fact that the broker had rendered services under an oral agreement did not constitute a change of position to his detriment. (*Id.,* at p. 70.) He suffered no unconscionable injury. Stated another way, the broker's reliance on the oral contract was not reasonable in light of the broker's presumed knowledge of the requirements of the statute of frauds. To give rise to equitable estoppel, the promisee's reliance must be reasonable. (See Bigelow, Law of Estoppel (6th ed. 1913) p. 682; Note, *Part Performance, Estoppel and the California Statute of Frauds* (1951) 3 Stan.L.Rev. 281, 289.) We agree with the statement in *Pacific Southwest* that the broker "assumed the risk of relying upon claimed oral promises of defendant, and it [the broker] has no cause for complaint if its efforts go unrewarded." (47 Cal.2d at p. 70; *Marks* v. *Walter G. McCarty Corp., supra,* 33 Cal.2d 814, 823.) Phillippe did nothing more than perform services pursuant to an invalid agreement. Phillippe's reliance on the oral contract was not reasonable, and he therefore suffered no unconscionable injury. (*Colburn* v. *Sessin* (1949) 94 Cal.App.2d 4, 6 [209 P.2d 989].)

In accord with our analysis that a licensed broker cannot reasonsbly rely on an unenforceable oral promise of compensation, we disapprove of *Le Blond* v. *Wolfe, supra,* 83 Cal.App.2d 282, to the extent that the court allowed a licensed broker to assert equitable estoppel. The broker contended that he had suffered an unconscionable injury by cancelling an otherwise valid contract with a real estate seller in reliance on the buyer's oral promise that he would pay the broker's commission. A broker cannot create an unconscionable injury by taking extreme action. If it is unreasonable to

to, relevant legislation, regulations, articles, reports, studies, court decisions, treatises, and information of current interest." (Italics added.)

perform services in reliance on an oral promise the broker knows to be invalid under the statute of frauds, it is even more unreasonable to cancel an enforceable written contract in reliance on an oral promise that the broker knows to be unenforceable.

 Phillippe's reliance was especially unreasonable in light of his knowledge that Shapell is also a licensed broker. Phillippe had to have known that Shapell was aware that commission agreements must be in writing. That Shapell never confirmed in writing any agreement regarding the Great Lakes property should have indicated to Phillippe that Shapell believed either there was no such agreement or that it would not be enforceable. (We do not suggest that Shapell secretly intended to rely on section 1624(d) to avoid what Shapell itself believed was an agreement with Phillippe. There is no such evidence in the record.)

The alternate basis for estoppel is unjust enrichment. Phillippe has not shown any unjust enrichment of Shapell. The most Phillippe has shown is that Shapell did not pay for his services. The fact that a broker's principal does not pay for the broker's services under an unenforceable oral contract does not constitute unjust enrichment sufficient to support equitable estoppel. In *Marks* v. *Walter G. McCarty, supra,* 33 Cal.2d 814, the court denied recovery to a broker under an oral contract despite having accepted the trial court's finding that the broker was the procuring cause of the sale. Likewise here, the jury's finding that Phillippe was the procuring cause of the sale to Shapell does not by itself establish unjust enrichment sufficient to give rise to equitable estoppel.[11]

To determine that mere nonpayment constitutes unjust enrichment sufficient for estoppel would also conflict with consistent holdings that licensed brokers, who cannot recover under oral agreements invalid under the statute of frauds, are also prohibited from recovery in quantum meruit

---

[11] " 'A broker is the "procuring cause" of a real estate transaction if he finds a purchaser [or seller] who is ready, willing, and able to buy [or sell] the property on the terms stated and he obtains a valid contract obligating the purchaser [or seller] on these terms.' " (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 820, fn. 2 [122 Cal.Rptr. 745, 537 P.2d 865].) Even if a finding of procuring cause could equate in some circumstances to unjust enrichment of the broker's principal, we do not believe those circumstances are present in this case. Phillippe's last attempts to bring about a sale of the Great Lakes property to Shapell were in early 1974. Although the property was rezoned in February 1974 to a construction density that was acceptable to Shapell, nothing more happened until the end of 1975 when Shapell's vice president contacted the property owner and learned the property was still available. Direct negotiations between the owner and Shapell led to the eventual sale. Shapell's refusal to pay Phillippe a real estate commission does not rise to the level of unjust enrichment in light of the fact that the sale was consummated approximately one and one-half years after Phillippe's involvement had ceased and was negotiated directly between the seller and Shapell without assistance from Phillippe.

for the reasonable value of their services. (*Beazell* v. *Schrader* (1963) 59 Cal.2d 577, 582 [30 Cal.Rptr. 534, 381 P.2d 390]; *Jamison* v. *Hyde* (1903) 141 Cal. 109, 113 [74 P. 695]; *Augustine* v. *Trucco, supra,* 124 Cal.App.2d 229, 237-238.) "[T]he purpose of the statute would be largely defeated if the broker should be allowed to recover in quantum meruit for his services . . . , either on the oral contract itself or in quasi-contract for reasonable compensation. This is made obvious by the fact that reasonable compensation would be determined by the commission that is customarily paid in the community, and the oral contract that the broker alleges to have been made is practically always a contract to pay this customary commission." (2 Corbin on Contracts (1950) § 416, p. 438.) The quantum meruit theory of recovery in these circumstances "has been so roundly rejected by the [California] courts that many recent attempts by brokers to recover commissions do not even raise it." (Cal. Real Property Sales Transactions (Cont.Ed.Bar 1981) § 2.55, p. 110.) The authors of the Restatement Second of Contracts reached the same conclusion. Section 375 states: "A party who would otherwise have a claim in restitution under a contract is not barred from restitution for the reason that the contract is unenforceable by him because of the Statute of Frauds *unless the statute provides otherwise or its purpose would be frustrated by allowing restitution.*" (Italics added.) Comment *a,* illustration 3 of section 375 expressly states that recovery in restitution by a real estate broker would frustrate the purpose of the statute. The overwhelming majority of other jurisdictions has adopted the Restatement view. (See, Annot. (1955) 41 A.L.R.2d 905, 908; 7 Powell, The Law of Real Property (Rohan ed. 1987) ¶ 938.16[3], pp. 84C-56 to 84C-63.) If nonpayment is insufficient to allow recovery in quantum meruit, nonpayment is equally insufficient to support equitable estoppel on the ground of unjust enrichment.

■ There would be no point in deciding, as we have, that a licensed broker cannot show an unconscionable injury sufficient to assert estoppel based only on the fact that the broker performed services without payment, but then to conclude that the nonpayment constitutes unjust enrichment sufficient to allow estoppel. A dissatisfied broker could prevail by merely labeling his theory of recovery as unjust enrichment rather than unconscionable injury.

■ We hold that a licensed real estate broker or salesperson cannot assert equitable estoppel against a statute of frauds defense to an oral commission agreement that is subject to Civil Code section 1624(d) unless there is a showing of actual fraud by the party to be charged under the invalid oral agreement. Because licensed brokers are involved in almost every real estate sale, to decide otherwise would be to eviscerate if not abrogate section 1624(d).

*Sound Policy Reasons Support the Denial of Equitable Estoppel to a Licensed Broker.*

The original statute of frauds was enacted in England more than 300 years ago. (An Act for the Prevention of Frauds and Perjuries, 1677, 29 Car. 2, ch. 3.) Variations of the original English statute have been widely enacted in the United States. The State of California first enacted its version in 1872. The Legislature expanded the statute in 1878 to include real estate commission agreements. Despite much criticism, section 1624(d) remains effective more than a century after its passage. Whatever else it may be, section 1624(d) is durable.

The statute of frauds is also indisputably significant. It has been characterized as, "the most important statute ever enacted in either country [England and the United States], relating to civil affairs." (Bishop, Law of Contracts (1878) § 498, p. 177.) By acknowledging the statute's importance, we do not express our opinion as to its worth. Whether this court likes section 1624(d) is not relevant to our decision. We have no prerogative to create an exception that would effectively render this durable and important statute a nullity. ■ "Courts may not read into a statute an exception not incorporated therein by the Legislature [citation omitted], unless such an exception must reasonably and necessarily be implied . . . ." (*Pacific Motor Transport Co.* v. *State Bd. of Equalization* (1972) 28 Cal.App.3d 230, 235 [104 Cal.Rptr. 558]; cf. *Estate of Banerjee* (1978) 21 Cal.3d 527, 540 [147 Cal.Rptr. 157, 580 P.2d 657] [exceptions to a general provision of a statute are strictly construed].) If section 1624(d) should be modified, the Legislature can do so.

We believe the legislative preference for written contracts is stronger than ever before. The Legislature has demonstrated with increasing frequency its desire to provide consumers with the security and certainty of written contracts in a wide variety of transactions. This legislative trend is not new. More than 20 years ago, a commentator noted that, "[n]otwithstanding what appears to be a disfavorable attitude of the courts towards the Statute [of Frauds], the legislative trend has been in the direction of expanding rather than restricting the scope of the writing requirement." (Comment, *Equitable Estoppel and the Statute of Frauds in California, supra,* 53 Cal.L.Rev. 590, 592, fn. 15.) A brief list of consumer contracts now required to be in writing demonstrates this clear legislative purpose: home improvement contracts in excess of $500; (Bus. & Prof. Code, § 7159, enacted 1969); mobilehome sales (Health & Saf. Code, § 18035.1, enacted 1981); prepaid rental listing services (Bus. & Prof. Code, § 10167.9, enacted 1980); home solicitation contracts (Civ. Code, § 1689.7, enacted 1971); automotive repairs (Bus. & Prof. Code, § 9884.9, enacted 1971); dance studio lessons

(Civ. Code, § 1812.52, enacted 1969); health studio services (Civ. Code, § 1812.82, enacted 1962); discount buying services (Civ. Code, § 1812.107, enacted 1976); funeral services (Bus. & Prof. Code, § 7685.2, enacted 1971); and attorney fee contracts (Bus. & Prof. Code, § 6147, as amended 1986, and § 6148, enacted 1986). There are other examples too numerous for recitation.[12]

Section 1624(d) can equally be characterized as a consumer protection statute, perhaps this state's first. The essential purpose of the statute is reflected in the very title of its English precursor, "An Act for Prevention of Frauds and Perjuries." The purchase or sale of real estate, especially a home, is always a significant event. For most people, such purchase or sale is probably the single most important financial transaction in their lives. Commercial real property transactions are of similar importance to the parties involved. Section 1624(d) manifests a valid legislative intent to protect real estate buyers and sellers from unfounded claims for brokers' commissions. The statute of frauds also serves a cautionary purpose. By requiring a writing, the statute serves to emphasize to contracting parties the significance of their agreement. The importance of real estate transactions makes this aspect of the statute especially salutary.

---

[12] The dissent suggests that we should ignore section 1624(d) in the present case in light of *Asdourian* v. *Araj* (1985) 38 Cal.3d 276 [211 Cal.Rptr. 703, 696 P.2d 95], in which we upheld the enforceability of an oral home improvement contract under Business and Professions Code section 7159, one of the statutes cited above that requires contracts to be in writing. We cited section 7159 as one of several examples of the Legislature's increasing preference for written contracts. That legislative trend is not diminished or disputed by the court's decision in *Asdourian*. Moreover, *Asdourian* is distinguishable from the present case in several important respects: (1) Section 1624(d) expressly provides that oral contracts are "invalid." Business and Professions Code section 7159, the statute construed in *Asdourian*, merely requires oral home improvement contracts to be in writing; section 7159 does not expressly state that they are invalid. The *Asdourian* court emphasized that there was no indication the Legislature intended contracts in violation of Business and Professions Code section 7159 to be unenforceable. (38 Cal.3d at pp. 291-292.) By contrast, the Legislature expressly provided in section 1624(d) that oral contracts for brokerage commissions are invalid, i.e., *unenforceable*. (2) Violation of Business and Professions Code section 7159 is a misdemeanor punishable by fine and/or imprisonment. The *Asdourian* court explained that such penalties should be sufficient to serve the underlying legislative policy of that statute. (38 Cal.3d at p. 292.) Section 1624(d), however, does not provide for criminal penalties so it is even more important to preserve the statute's efficacy by strict enforcement. (3) There are significant differences between home improvements and brokerage commissions. Home improvements are tangible and can be relatively easily verified and appraised to determine their reasonable value. Such was the case in *Asdourian*, in which the contractor recovered the reasonable value of his services. A broker's services do not result in a tangible product so it is more likely that there will be disputes as to what the broker has done and what such services may be worth. As in *Asdourian*, a home improvement dispute will typically involve only a single contractor seeking to recover. Due to the nature of the real estate business, however, several competing brokers may claim a commission for a single transaction. Written contracts help minimize such confusion.

Faced with a clear legislative desire for written contracts in a wide variety of contexts and the special significance of real estate transactions, we cannot conclude that section 1624(d) is a legislative anachronism that should be judicially swept away. ■ In *Buckaloo* v. *Johnson, supra,* 14 Cal.3d 815, which also involved a licensed broker's commission, the court made clear that, "[t]he statute of frauds conclusively establishes that brokerage contracts with either the vendor or the vendee must be in writing. We have neither the authority nor the inclination to circumvent that declared policy . . . ." (*Id.,* at p. 827.) Our view has not changed.

It is not unfair to require licensed brokers to comply with the statute of frauds. Only those persons licensed by the California Department of Real Estate may lawfully act as real estate brokers in this state. (Bus. & Prof. Code, § 10130.) To bring an action to recover a real estate commission, a broker must plead and prove that he was duly licensed at the time his cause of action arose. (Bus. & Prof. Code, § 10136.) The effect of these laws is obvious—only a person duly licensed may earn and recover compensation as a real estate broker. It is not too much to ask in return for that valuable privilege that a licensed broker comply with the statute of frauds.

Section 1624(d) is perhaps more fairly applied now against brokers than when first enacted. Brokers were not then required to be licensed, and they may have had little or no legal knowledge. Application of section 1624(d) might have come as a surprise a century ago. In view of the current educational requirements, a broker cannot be surprised by section 1624(d).

Phillippe, the California Association of Realtors as amicus curiae, and various commentators contend that brokers are often not in sufficiently strong bargaining positions to obtain written employment contracts from their principals and suggest that this disparity of bargaining power is most common in the commercial real estate market. Phillippe urges that section 1624(d) should not bar recovery on an oral contract in that situation because the statute is contrary to industry custom and practice. We reject that contention for several reasons.

Section 1624(d) does not include an exception based on the relative bargaining strength of the parties to a contract. Any such exception must be created by the Legislature, not by this court. If the Legislature believes that section 1624(d) is not workable in the real estate marketplace, the Legislature can act accordingly.[13] Even if we had the prerogative and inclination to

---

[13] That such change is within the Legislature's purview is demonstrated by its enactment of California Uniform Commercial Code section 2201, the statute of frauds applicable to sales of goods. Subdivision (2) of that statute provides special, somewhat relaxed, standards for written contracts in transactions between merchants. By enacting that provision, the Legisla-

create judicially such an exception, we have been provided with no factual basis for doing so. Phillippe did not introduce any evidence that there was an inequitable disparity between himself and Shapell. Amicus curiae and the legal commentators also cite no facts, and we are unaware of any, that support their criticism that the marketplace and the statute are in conflict. We decline to create a major exception to section 1624(d), and in so doing set aside decades of precedent, based on the unsupported assertions of the statute's critics.

The lack of evidence aside, we are not persuaded that section 1624(d) is inappropriate merely because there may be a disparity of bargaining power between a broker and his principal. The resolution of disputes would be complicated. Even defining bargaining power would be troublesome. Would it include legal knowledge and commercial sophistication? If so, how would a court measure those factors? Would it include financial strength? If so, to determine whether there was a disparity, a court would likely have to conduct a detailed examination of the parties' respective financial conditions thus creating a need for considerable pretrial discovery and protracted litigation.

Those engaged in real property transactions ordinarily desire certainty in their financial dealings. If bargaining power were relevant, the parties would not know (and could not know) at the time of entering into an oral agreement whether it would be an enforceable contract. Each party would have to speculate as to whether he posssessed some quality, e.g., finances, knowledge, or even better negotiating skills, that created an imbalance in bargaining power. Whenever a dispute arose, a court would then have to determine whether there was a disparity of power. To hold that the validity of a commission agreement depends on relative bargaining power would lead to great uncertainty. We believe a distinction based on disparity of bargaining power would lead to unnecessary complexities.

We are also not persuaded that section 1624(d) should be disregarded in a commercial setting. That suggestion is premised on the unsupported allegation that written commission agreements are often not used in commercial real estate transactions.[14] No evidence is before us regarding industry cus-

---

ture changed California law regarding sales of goods. (See 23A West's Ann. Cal. U. Com. Code (1964 ed.) § 2201, com. 5, p. 129.) The Legislature can also change section 1624(d).

[14]Phillippe and his fellow critics of section 1624(d) do not explain what they mean by "commercial transactions." We assume for purposes of discussion that they mean transactions between businesses engaged primarily in real estate investment. We note, however, that a consistently workable definition of "commercial transactions" would be extremely difficult to formulate. Such definition might cover the spectrum from a sophisticated land developer buying undeveloped land to an individual buying a vacation home for investment purposes.

tom. We decline to speculate as to what the custom, if any, may be.[15]

We are inclined to believe that the business community in general may favor written contracts. They provide certainty and predictability. In the only empirical study we have been able to locate, more than half of the businesses (manufacturers) surveyed favored enforcement of only those agreements that comply with the statute of frauds, and almost two-fifths favored a change in the law to make even fewer agreements enforceable. (Comment, *The Statute of Frauds and the Business Community: A Re-appraisal in Light of Prevailing Practices* (1957) 66 Yale L.J. 1038, 1058.) More than 50 years ago, one of the leading commentators on contracts observed that the statute of frauds was even then becoming more useful due to the increasing volume and complexity of commercial transactions. (Llewellyn, *What Price Contract?—An Essay in Perspective* (1931) 40 Yale L.J. 704, 747.) The commercial world is now even more complex, and Llewellyn's observation appears to remain sound, perhaps more so than when he made it. The business community's preference for written contracts was stated most colorfully in the memorable malaprop attributed to motion picture producer Samuel Goldwyn: "An oral contract isn't worth the paper it's written on." (Shavelson, *Hollywood Signs: Movie Moguls Who Gave the Golden Era Its Shine*, L. A. Times (July 27, 1986) Calendar Section, p. 24.) Written contracts appear to have diverse, substantial support.

Last and most important, there is no exception for commercial transactions stated in the statute. An unequivocal statute must take precedence over mere custom. Indeed, the widespread custom of not using written contracts in real estate transactions was apparently a reason why section 1624(d) was enacted in the first instance.

*Our Decision Does Not Leave Licensed Brokers Unprotected.*

In *Tenzer v. Superscope, supra,* 39 Cal.3d 18, the court held that the statute of frauds does not preclude an action for actual fraud. (*Id.,* at pp. 28-31.)[16] Although the plaintiff in *Tenzer* was an unlicensed real estate finder, the *Tenzer* court did not distinguish in its discussion of actual fraud between unlicensed finders and licensed brokers and did not suggest that its holding regarding actual fraud should be limited to unlicensed finders. (This lack of

---

[15] The assertion that written contracts are not often used may be incorrect. The use of oral commission agreements is apparently viewed as unprofessional by many in the real estate industry. (Bowman & Milligan, Real Estate Law in Cal. (7th ed. 1986) § 3.14, p. 53.)

[16] The court had previously suggested that actual fraud might give rise to equitable estoppel. In *Pacific Southwest, supra,* 47 Cal.2d 62, 70, the court noted that equitable estoppel was not appropriate in the absence of a showing of actual fraud. Similarly, in *Beazell v. Schrader, supra,* 59 Cal.2d 577, 582, the court refused to rely on equitable principles to enforce an oral broker's employment agreement but noted that the defendant was not charged with any improprieties other than his failure to perform an oral contract.

distinction between unlicensed finders and licensed brokers is in marked contrast to the *Tenzer* court's careful distinction between the two groups in its discussion of equitable estoppel.)

Phillippe did not plead a cause of action for actual fraud. We believe it necessary, however, to explain how our present holding necessarily would affect an action by a licensed broker for actual fraud. ▪ To recover for fraud in any case the plaintiff must show that he reasonably relied on the defendant's misrepresentations. The plaintiff cannot recover if his reliance was not justified or reasonable. (*Wagner* v. *Benson* (1980) 101 Cal.App.3d 27, 36 [161 Cal.Rptr. 516]; see generally 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 475, p. 2734; 3 Pomeroy, Equity Jurisprudence (5th ed. 1941) § 891, pp. 505-510.) ▪ As discussed above, a broker's presumed knowledge of the statute of frauds precludes him from showing the reasonable reliance on an oral agreement that is necessary to assert equitable estoppel. (*Pac. etc. Dev. Corp. v. Western Pac. R. R. Co., supra,* 47 Cal.2d 62, 70; *Marks* v. *Walter G. McCarty Corp., supra,* 33 Cal.2d 814, 823; *Osborne* v. *Huntington Beach etc. School Dist.* (1970) 5 Cal.App.3d 510, 515 [85 Cal.Rptr. 793].) Likewise, an oral promise by a broker's principal to execute the required writing at a later date will not give rise to estoppel. (*Colburn* v. *Sessin, supra,* 94 Cal.App.2d 4, 5.) By parity of reasoning, a broker's reliance on an oral promise to pay a commission or an oral promise to execute the required writing at a later date cannot be sufficiently reasonable to support an action for fraud. A broker's reliance, however, on a representation that the necessary contract has in fact been executed may be reasonable and thus support an action for fraud or the assertion of equitable estoppel. (§ 1623; *Owens* v. *Foundation for Ocean Research, supra,* 107 Cal.App.3d 179, 183-184.)[17]

There may be other types of promises on which a broker could reasonably rely. We do not purport in this opinion to identify every such promise. We believe, however, that a licensed broker's reliance can be reasonable only in rather limited circumstances. Whether a broker's reliance is reasonable must be determined on the facts of each case.

## CONCLUSION

We hold that Phillippe's alleged oral commission agreement is invalid under section 1624(d). Phillippe cannot avoid the requirements of section 1624(d) by asserting equitable estoppel. We reverse the judgment in all

---

[17] Section 1623 provides: "Where a contract, which is required by law to be in writing, is prevented from being put into writing by the fraud of a party thereto, any other party who is by such fraud led to believe that it is in writing, and acts upon such belief to his prejudice, may enforce it against the fraudulent party."

respects and remand with directions to enter judgment including costs on appeal in favor of Shapell. In light of our decision, we need not address the issues raised by Phillippe in his cross-appeal.

Lucas, C. J., Arguelles, J., Roth (Lester Wm.), J.,* and Woods (Arleigh M.), J.,† concurred.

KAUFMAN, J.—I respectfully dissent.

The majority opinion broadly holds that except in cases of actual fraud, a licensed real estate broker may not assert equitable estoppel to avoid the statute of frauds—regardless of the particular facts and circumstances of the case, of the relative equities of the parties, or of the injustice that may result absent an estoppel. Neither settled law nor sound public policy supports such a harsh and inflexible rule. My views on the matter are set forth below.

The first statute of frauds was enacted several hundred years ago to prevent "many fraudulent practices . . . ." (An Act for Prevention of Frauds and Perjuries, 1677, 29 Car. 2, ch. 3 (1677).) Its function in modern society has been described as two-fold: first, "evidentiary," in the sense that a writing obviates the opportunity for fraud through perjury and limits disputes over whether a contract has been formed or over the terms thereof; and second, "cautionary," on the theory that a writing serves to prevent hasty bargains and impresses upon the parties the solemnity of the agreement. (See Comment, *Equitable Estoppel and the Statute of Frauds in California* (1965) 53 Cal.L.Rev. 590, 591.) Thus as the majority opinion points out, the statute of frauds enjoys continued vitality today in the form of numerous and varied consumer protection statutes. (Majority opn., *ante,* at p. 1265.) And both evidentiary and cautionary functions are clearly well served by provisions such as the one at issue here, subdivision (d) of Civil Code section 1624 (hereafter section 1624(d)), which provides, inter alia, that agreements authorizing a broker to find a purchaser or seller of real estate must be in writing and signed by the party to be charged. As the majority opinion notes, section 1624(d) serves both to "protect real estate buyers and sellers from unfounded claims for brokers' commissions . . .", as well as to impress on "contracting parties the significance of their agreement." (Majority opn., *ante,* at p. 1266].)

The doctrine of equitable estoppel developed out of the recognition that equity must occasionally estop the assertion of the statute of frauds precise-

*Presiding Justice, Court of Appeal, Second Appellate District, Division Two, assigned by the Chairperson of the Judicial Council.

†Presiding Justice, Court of Appeal, Second Appellate District, Division Four, assigned by the Chairperson of the Judicial Council.

ly in order to prevent the perpetration of a fraud. (See *Colon* v. *Tosetti* (1910) 14 Cal.App. 693, 695 [113 P. 365] ["The statute of frauds is for the prevention, not in aid of the perpetration, of fraud."].) In *Monarco* v. *Lo Greco* (1950) 35 Cal.2d 621, 623-624 [220 P.2d 737], this court established and explained the modern doctrine as follows: "The doctrine of estoppel to assert the statute of frauds has been consistently applied by the courts of this state to prevent fraud that would result from refusal to enforce oral contracts in certain circumstances. Such fraud may inhere in the *unconscionable injury* that would result from denying enforcement of the contract after one party has been induced by the other seriously to change his position in reliance on the contract [citations], or in the *unjust enrichment* that would result if a party who has received the benefits of the other's performance were allowed to rely upon the statute. [Citations.] In many cases both elements are present. Thus not only may one party have so seriously changed his position in reliance upon, or in performance of, the contract that he would suffer an unconscionable injury if it were not enforced, but the other may have reaped the benefits of the contract so that he would be unjustly enriched if he could escape its obligations. [Citations.]" (Italics supplied.)

Under the broad equitable principles set forth in *Monarco,* the trier of fact exercises considerable discretion in determining whether to enforce the statute of frauds or to estop its effect in the interests of justice. (See *Mehl* v. *People* ex rel. *Dept. Pub. Wks.* (1975) 13 Cal.3d 710, 715-716 [119 Cal.Rptr. 625, 532 P.2d 489] ["Estoppel is a question of fact, and the determination of the trier of fact is binding on appeal unless the contrary conclusion is the only one that can reasonably be drawn from the evidence."].) Each case requires a balancing of the interests of the plaintiff that would be lost through enforcement of the statute against the interests of the state that the statute was designed to protect. (*Tri-Q, Inc.* v. *Sta-Hi Corp.* (1965) 63 Cal.2d 199, 219-220 [45 Cal.Rptr. 878, 404 P.2d 486]; Macaulay, *Justice Traynor and the Law of Contracts* (1961) 13 Stan.L.Rev. 812, 828, fn.46 ["The new position [under *Monarco*] calls for a case-by-case definition of when reliance is 'unconscionable' and when enrichment is 'unjust.'"].)

Nothing in the holding or the reasoning of *Monarco, supra,* 35 Cal.2d 621, suggests that the general equitable principles set forth therein were meant to be *limited* to any particular class of contracts or group of plaintiffs. Indeed, as this court wrote years earlier in *Seymour* v. *Oelrichs* (1909) 156 Cal. 782 at page 795 [106 P. 88]: "We can see no good reason for limiting the operation of this equitable doctrine to any particular class of contracts included within the statute of frauds, provided always the essential elements of an estoppel are present, or for saying otherwise than as is intimated by Mr. Pomeroy in the words already quoted, viz., that it applies

'in every transaction where the statute is invoked.' " (See also *Moore* v. *Day* (1954) 123 Cal.App.2d 134, 138-139 [266 P.2d 51].) Although the doctrine of equitable estoppel has certainly expanded since *Seymour* v. *Oelrichs* was decided, nothing we have said or intimated since then has indicated an intent to reverse that holding or to prohibit use of the equitable doctrine in the context of any particular class of contracts within the statute of frauds.

Nevertheless, the notion has gained currency among the Courts of Appeal, partly in reliance on this court's decision in *Pacific etc. Dev. Corp.* v. *Western Pacific R. R. Co.* (1956) 47 Cal.2d 62 [301 P.2d 825], and partly on the basis of the public policy underlying section 1624(d), that licensed real estate brokers are precluded as a matter of law from invoking equity to estop the assertion of section 1624(d). Neither settled law nor sound public policy supports this conclusion.

Since *Monarco,* supra, 35 Cal.2d 621 this court has considered a licensed broker's suit on an oral employment contract in three cases. The first of these, *Pacific etc. Dev. Corp.* v. *Western Pac. R. R. Co., supra,* 47 Cal.2d 62, involved a broker's suit for a 5 percent commission on an oral contract to procure an option to purchase certain land. Nelson, the broker, had engaged in negotiations with the defendant, the prospective buyer, over various propositions and offers that might be made for the purchase, but no final arrangements were made for Nelson's employment or for the final terms of any offer. During the course of negotiations, Nelson left his employer, the Fortune Realty Company, to become an employee of plaintiff, the Pacific Southwest Realty Corp. Subsequent negotiations between Nelson, plaintiff's president and defendant resulted in an offer of $2,500 per acre and $1,500 for the option, but the owner of the property declined the offer. One month later, without further call on Nelson or plaintiff, defendant purchased the property for $2,750 an acre and forwarded a check representing a 2 1/2 percent commission to Nelson's former employer, Fortune Realty, with the understanding that half of the commission was to go to Nelson. Plaintiff thereupon sued defendant on an alleged oral agreement to pay it a 5 percent commission. The trial court entered judgment in favor of defendant on the ground that the agreement was not in writing as required by the statute of frauds.

We affirmed, holding, inter alia, that defendant was not estopped to plead the statute of frauds merely "by reason of the fact that [defendant] . . . finally concluded an option agreement with [the owner] for purchase of the property and the sale was subsequently consummated." (47 Cal.2d at p. 70.) We further stated: "The fact that plaintiff rendered services and conducted unsuccessful negotiations with [the property owner] does not constitute a change of position to plaintiff's detriment, nor does the fact that defendant

refused to pay plaintiff a real estate commission . . . constitute an unjust enrichment within the meaning of the estoppel doctrine. . . .[¶] Plaintiff is a licensed real estate broker and, as such, is presumed to know that contracts for real estate commissions are invalid and unenforceable unless put in writing and subscribed by the person to be charged." (*Ibid.*)

The foregoing language from *Pacific* has been cited as the basis for a strict application of section 1624(d) (see, e.g. *Jaffe* v. *Albertson Co.* (1966) 243 Cal.App.2d 592, 605 [53 Cal.Rptr. 25]), and indeed, constitutes the principal authority in the majority opinion in support of that proposition (majority opn. *ante* at p. 1260). Such reliance is misplaced. Nothing in *Pacific* suggests that this court was announcing an ironclad rule of law prohibiting the use of equitable estoppel in any action by a licensed real estate broker on an oral contract. Rather, it is reasonably clear from the court's extensive recitation of the facts in its discussion of estoppel, that the decision was based simply on the grounds that the facts did not establish an estoppel. (47 Cal.2d at pp. 70-71.) The equities in favor of the plaintiff brokerage firm were not compelling: it had entered the negotiations late and apparently had contributed little to what Nelson had already accomplished while employed by Fortune Realty; furthermore, as the court noted, "no option to purchase at $2,500 per acre was ever obtained," and finally, there was no unjust enrichment, since defendant *had* paid a broker's commission, albeit to the original parties, Nelson and Fortune Realty, rather than to the plaintiff. (47 Cal.2d at p. 71.)

Since the 1956 decision in *Pacific,* this court has considered a broker's suit on an oral contract in two cases, *Beazell* v. *Schrader* (1963) 59 Cal.2d 577 [30 Cal.Rptr. 534, 381 P.2d 390] and *Franklin* v. *Hansen* (1963) 59 Cal.2d 570 [30 Cal.Rptr. 530, 381 P.2d 386]. Although neither case involved an assertion of equitable estoppel, both cases clearly suggest that such a claim would not have been precluded. In *Beazell,* the plaintiff broker had actually received a 2 1/2 percent commission provided for in the escrow instructions but sued the seller for a 5 percent commission based on an oral agreement. We held that the broker was limited to the amount set forth in the escrow agreement by reason of the statute of frauds, but noted: "The complaint fails to charge defendant with any improprieties other than his failure to perform the oral contract." (59 Cal.2d at p. 582.) Clearly, there would have been little point in noting that plaintiff had failed to allege a basis for equitable relief, if such relief were unavailable as a matter of law.

Similarly, in *Franklin* v. *Hansen, supra,* 59 Cal.2d 570, the plaintiff failed to allege estoppel, although unlike in *Beazell* the facts might have supported a claim of unconscionable injury, because plaintiff had clearly relied on an oral agreement to his serious detriment. However, as the *Franklin* court

noted, "Plaintiff herein has neither alleged nor urged the application of an equitable estoppel, pursuant to which doctrine a party to an oral agreement might be estopped to rely on the statute of frauds in instances where the elements of the doctrine can be established. (See *Monarco* v. *Lo Greco,* 35 Cal.2d 621, 626 [220 P.2d 737].)" (59 Cal.2d at pp. 576-577.) Again, by expressly noting that plaintiff had not alleged equitable estoppel, and by specifically citing *Monarco* in this context, the conclusion is fairly inescapable that we did not consider equitable relief from the statute of frauds to be foreclosed as a matter of law.

Notwithstanding the absence of any compelling legal authority, the majority opinion concludes that a rigid application of section 1624(d) is nevertheless compelled by reasons of public policy. Because of their training and experience, licensed brokers are presumed to know that contracts for real estate commissions must be in writing. (*Pacific, supra,* 47 Cal.2d at p. 70.) Section 1624(d) is thus designed to protect buyers and sellers of property from possible exploitation by licensed brokers asserting false claims for commissions. (*Pacific, supra,* 47 Cal.2d at p. 70.)

I certainly have no quarrel with either of these propositions; the relative sophistication of the broker and the prophylactic purposes underlying the statute are undeniably relevant factors to be considered in balancing the respective equities in any given case. However, as this court has recently recognized in circumstances strikingly similar to those in the case at bar, the policies underlying the statute of frauds are not uniformly implicated in every case, and in any event such policies must be considered in light of the equitable interests of the plaintiff and the economic realities of the particular transaction. (See *Asdourian* v. *Araj* (1985) 38 Cal.3d 276, 292 [211 Cal.Rptr. 703, 696 P.2d 95].)

The majority opinion cites a number of consumer-oriented statutes to demonstrate the continued vitality of the statute of frauds in modern society. Among the statutes cited is Business and Professions Code section 7159, which provides that "home improvement" contracts between licensed contractors and property owners must be in writing and signed by all of the parties to the agreement. Violation of the statute constitutes a misdemeanor. In *Asdourian* v. *Araj, supra,* however, we held that even a contract which is illegal under this section may be enforced to avoid unjust enrichment or unconscionable injury. In that case, a licensed contractor brought an action against a property owner for work performed pursuant to an oral remodeling contract. Defendant asserted that the action was barred under Business and Professions Code section 7159. The trial court found in favor of the plaintiff and awarded damages for the reasonable value of the work performed.

We affirmed. While acknowledging that courts generally will not enforce an illegal contract or one against public policy, we also noted that " 'the rule is not an inflexible one to be applied in its fullest rigor under any and all circumstances,' " and that in compelling cases "illegal contracts will be enforced in order to 'avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff.' " (38 Cal.3d at pp. 291-292, quoting *Southfield* v. *Barrett* (1970) 13 Cal.App.3d 290, 294 [91 Cal.Rptr. 514].) " ' "In each case, the extent of enforeceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts." ' " (*Id.* at p. 292, quoting *South Tahoe Gas Co.* v. *Hofmann Land Improvement Co.* (1972) 25 Cal.App.3d 750, 759 [102 Cal.Rptr. 286].)

Applying these principles in *Asdourian,* we found that the policy behind section 7159—to protect "unsophisticated consumers"—did not apply to the defendant, a relatively knowledgable real estate investor. (38 Cal.3d at p. 292.) We also noted that the parties "had had business dealings in the past," that plaintiff had "fully performed according to the oral agreements" and that defendants had "accepted the benefits" of the agreements and would be unjustly enriched if allowed to retain such benefits without being required to compensate the plaintiff. (*Id.* at p. 293.) While conceding that, "[a]s a contractor, plaintiff should have been aware that the contracts were required to be in writing," we nevertheless concluded: "The penalty which would result from the denial of relief would be disproportionately harsh in relation to the gravity of the violations." (*Id.* at p. 294.)

Thus, even where a licensed contractor brings suit on an *illegal* oral contract, we have recognized that the countervailing facts may be so compelling as to preclude the court or jury in good conscience from enforcing the statute. A fortiori, where the failure to execute a writing violates public policy but the contract is not otherwise illegal, I can perceive no reason to categorically deny equitable relief if the facts otherwise warrant it.

As *Asdourian, supra,* 38 Cal.3d 276, further demonstrates, the theoretical underpinnings of the statute of frauds cannot be viewed in isolation. Occasionally, as in *Asdourian,* the economic realities are such that the defendant is simply not a member of the class which the statute was designed to protect. This point has been stressed by a number of commentators critical of the view that equitable relief should not be extended to licensed real estate brokers. (See Comment, *Equitable Estoppel and the Statute of Frauds in California* (1965) 53 Cal.L.Rev. 590, 602, 609; Note, *Oral Employment Contracts and Equitable Estoppel: The Real Estate Broker as Victim* (1975) 26 Hastings L.J. 1503, 1524-1526; 1 Miller & Starr, Current Law of Cal. Real Estate (1975) § 1.54, pp. 69-74, fn. 8.) As we noted in *Tenzer* v. *Super-*

*scope, Inc.* (1985) 39 Cal.3d 18, 28, fn. 6 [216 Cal.Rptr. 130, 702 P.2d 212], these critics have pointed out that "[i]n today's market . . . brokers often deal with sophisticated principals in superior bargaining positions." In such circumstances, the broker may be powerless to compel the principal's cooperation in executing a written commission agreement, and the refusal to grant equitable relief from the statute of frauds may be unjust. (*Ibid.*) Indeed, as the record in the matter before us reveals, this was precisely such a case.

The majority opinion recites the *facts* well enough, but because of its conclusion that section 1624(d) precludes equitable relief as a matter of law, it ignores the *story* they tell. Defendant, Shapell Industries, Inc., is a publicly traded corporation engaged in the development of residential subdivisions and, as such, is continually engaged in the acquisition of land for that purpose. Although Shapell employed a well-trained staff to locate and acquire property (both Shapell and its vice president, Joseph Aaron, were licensed brokers), it relied to a large extent on outside brokers for leads. Because of its experience and expertise, however, Shapell generally used its own staff to negotiate the terms of sale directly with the property owners.

Shapell became acquainted with Phillippe, a licensed real estate broker, in 1972 when it purchased a 78-acre parcel of land on which Phillipe was the listing agent and paid Phillippe $153,100 for his services as broker. Thereafter, in January 1973, *Shapell contacted Phillippe* to engage his services in locating parcels in excess of 50 acres on the Palos Verdes Peninsula. Phillippe explained that he had no listings in that area and that his commission would have to be paid by Shapell as the buyer. Shapell *agreed,* orally promising to pay Phillippe a commission for any land submitted by him and purchased by Shapell, and also promising that his commission would be stated in any written offer made by Shapell to a seller.

Phillippe thereupon proceeded to familiarize himself with the Palos Verdes Peninsula, inspecting the area for vacant parcels, researching the land records and establishing contact with property owners and their representatives. In April 1973, Phillippe wrote to Shapell about a parcel of land owned by the Filiorum Corporation, stating in conformity with the master oral agreement his "understanding that Buyer will pay our firm a commission, which, when added to the net price of the land, will equal 6% of the total consideration." Shapell responded in early May with an offer to purchase the Filiorum property that *faithfully conformed to the oral agreement,* stating as promised that the buyer, Shapell, agreed to pay a commission to Phillippe's firm equal to 6 percent of the total consideration.

Although the Filiorum deal eventually fell through, *Shapell asked Phillippe to continue his work on the Palos Verdes Peninsula.* Several months

later, in August 1973, Phillippe wrote to Shapell again, informing the company of four additional properties which met Shapell's requirements, including a ninety-four-acre parcel located in the City of Rolling Hills Estates belonging to Great Lakes Properties. As he had previously done pursuant to the general oral agreement, Phillippe restated in his letter the ongoing fee agreement, to wit, that the "properties [were] presented with the understanding that Buyer agrees to pay [Phillippe] . . . a commission which when added to the net purchase price of the land will equal 6 percent of the total consideration . . . ." Phillippe received no written reply to the August letter.

The primary obstacle to the Great Lakes purchase proved to be not the asking price but the fact that the property was zoned for low density housing. Accordingly, Phillippe continued to work on the Great Lakes deal throughout 1973 and early 1974, meeting or talking on a regular basis with representatives of Shapell, the planning and zoning department of the City of Rolling Hills and the owner of the property. Phillippe's contact at Shapell during this period was Bill Snow, vice president of land acquisitions. Snow testified that in one of his early meetings with Phillippe the latter had reminded him that he had no listing with the seller and expected to receive payment from Shapell; Snow recalled that he told Phillippe such payment was "not a problem as long as the deal [was] otherwise satisfactory." He recalled: "We occasionally pa[id] the broker's commission, the buyer did . . . if a broker brought a good piece of land to me and I ended up buying it, I saw to it that he got compensated." It was Snow's specific understanding that *there was an agreement to pay [a] commission [to Phillippe] if we bought the property.*

Phillippe continued his efforts to facilitate a sale during the early months of 1974. In January, he met with the representative of the property owner and obtained a copy of an engineering study showing the feasability of a higher density project, which he passed on to Shapell together with a cover letter updating Shapell as to the current status of negotiations and progress before the planning commission. Phillippe continued to monitor the planning commission and in February informed Shapell of the commission's decision to grant the rezoning. In April, Ron Prince, an employee of Shapell, *called Phillippe* for an update on the property and mentioned that the project was being turned over to Joseph Aaron, a vice president of Shapell and a licensed broker himself. In a letter dated April 22, 1974, addressed to Mike Steponovich, vice president of Great Lakes Properties, Phillippe stressed that Shapell was interested in the purchase and "ha[d] the full capability to close the escrow." The letter closed as follows: "You may want to remind Joe Aaron that we have been working with you at the request of

Shapell over a period of time." The letter indicated that a courtesy copy was being sent to "Ron Prince - Shapell Industries."

In late April, Phillippe phoned Aaron to explain what had transpired in the negotiations thus far. In a followup letter addressed to Aaron and dated April 30, 1984, Phillippe reviewed the prior negotiations concerning the Great Lakes property and *reminded* him of the commission agreement, stating: "The commission arrangement on these properties between our firm and Shapell is spelled out in the August 9, 1973, letter [to Prince]."

Several subsequent attempts by Phillippe to discuss the sale with Aaron were rebuffed. Shapell eventually purchased the Great Lakes property in August 1976; the offer did not provide for any commission to Phillippe.

The story that emerges from these facts may be summarized as follows: Shapell, a major firm engaged in the acquisition and development of real property, contacted Phillippe, the proprietor of a small brokerage firm; Shapell engaged Phillippe to locate properties on the Palos Verdes Peninsula pursuant to a general oral agreement to pay a commission for any property that Phillippe located and Shapell purchased; in reliance on the agreement, Phillippe engaged in a concentrated effort to locate properties in the area with Shapell's full knowledge and implied encouragement; although no purchase resulted from Phillippe's locating the Filiorum property, Shapell did, as promised, provide in its offer for a 6 percent commission to be paid to Phillippe; thereafter, Shapell reaffirmed its desire for Phillippe to continue his efforts to locate properties and, through its employee Bill Snow, reconfirmed the master oral agreement to pay a commission with respect to the Great Lakes property; in reliance thereon, Phillippe continued to work on facilitating the Great Lakes deal, meeting or talking regularly with representatives of the city, the property owner and Shapell; Shapell employees were kept informed of and encouraged Phillippe's efforts to facilitate its purchase of the Great Lakes property; Phillippe, both orally and in writing, frequently reminded Shapell of the terms of the oral commission agreement, yet Shapell *never once demurred* to Phillippe's repeated affirmations of the oral commission agreement until shortly before the Great Lakes purchase was consummated.

It is difficult to conceive a more suitable occasion for the assertion of equitable estoppel. Clearly, both tests of estoppel, unconscionable injury *and* unjust enrichment, are present. The principal, Shapell, initiated the contact with Phillippe and not only induced reliance, but continually monitored and encouraged his performance. Furthermore, Shapell reaffirmed its original commitment to the general oral agreement, first in writing (in connection with the Filiorum deal), then orally (in connection with the

Great Lakes property) and finally through silent acquiescence as Phillippe labored and periodically sought confirmation of the oral understanding. Under the circumstances, failure to enforce the contract would clearly result in unconscionable injury.

It is true that Phillippe, as a licensed broker, must be presumed to have been aware of the requirement of a written contract. As we recognized in *Asdourian,* however, such presumed knowledge merits far less consideration when the principal, as here, is not only as sophisticated as the broker, but exercises even greater economic leverage. In this factual context, enforcement of the oral contract does not impair the policy of the statute. (*Asdourian* v. *Araj, supra,* 38 Cal.3d at pp. 292-294.)

Moreover, it is clear that Phillippe fully performed according to the oral agreement, and that Shapell richly profited from that performance. Under the circumstances, if Shapell is allowed to retain the benefits of Phillippe's performance without paying the agreed upon commission, Shapell will be unjustly enriched. (*Monarco* v. *Lo Greco, supra,* 35 Cal.2d at pp. 623-634; *Asdourian* v. *Araj, supra,* 38 Cal.3d at p. 293.)

As I stated in the beginning, it is axiomatic that the statute of frauds "is for the prevention, not in aid of the perpetration, of fraud. *It is to be used as a shield, not as a sword.*" *(Colin* v. *Tosetti, supra,* 14 Cal.App. at p. 695, italics supplied.) The holding of the majority opinion inverts this principle, wielding the statute as a sword in the name of "public policy" to condone an obvious injustice. As the facts in *this case* demonstrate, however, public policy is not seriously implicated and "would not be effectively served by allowing such an inequity." (*Asdourian* v. *Araj, supra,* 38 Cal.3d at p. 294.) Accordingly, I would affirm the judgment.

Broussard, J., concurred.