[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
"The law," Robert Bolt wrote in A Man For All Seasons, "is a causeway upon which so long as he keeps to it a citizen may walk safely." One of the most exacting causeways in the law is Connecticut's listing statute, Conn. Gen. Stat. 20-325a(b), which sets forth with specificity the requirements of a real estate listing agreement. Brokers who stay on this causeway will safely recover their commissions. Those who stray from the well-marked path will find themselves without recourse. The plaintiff in this case took an unauthorized detour from the causeway and is, consequently, lost in the shoals.
Coldwell Banker Commercial Real Estate Services ("CBC") is an enterprise employing licensed real estate brokers. Joseph CT Page 2553 Calabrese ("Calabrese") is a commercial developer in the Waterbury area and is the president and sole shareholder of Calabrese Development Corporation. This case involves two lots in the Naugatuck Industrial Park that Calabrese wished to develop for a specific commercial tenant, the Exmet Corporation ("Exmet").
In April and June 1988, Calabrese and his corporation signed an exclusive leasing listing agreement with CBC in which CBC agreed to negotiate a lease with Exmet, and Calabrese agreed to pay CBC a leasing commission. This was done in the following manner. On or about April 1, CBC sent Calabrese a listing agreement (Ex. A) and an accompanying schedule of sale and lease commissions (Ex. B). The listing agreement incorporated most of the terms of the contract, but the commission was determined by a somewhat complicated formula based on rents set forth in the schedule. The leasing agreement itself came back almost immediately signed "Owner: Calabrese Development Corp." by one Donald Proto, who, the court finds, was Calabrese's duly authorized agent. The schedule, however, did not accompany it. Telephone calls were made, and on June 6, the schedule was returned signed "Joseph L. Calabrese, Owner, by Donald Proto."
Who owned this property: Calabrese or his corporation? The answer, it turns out, was neither. The property was owned at all relevant times by the Borough of Naugatuck. There was, however, no trace of fraud here. The testimony submitted at trial makes it clear that CBC was perfectly aware all along that Naugatuck owned the property. CBC knew that Calabrese hoped to purchase the property, but it didn't know whether the ultimate purchaser would be Calabrese, the individual, or Calabrese's corporation. Indeed, there is nothing in the record to indicate that a purchase by either one was a sure thing at this point. Calabrese did not enter into a contract to purchase the property until September 27, 1988, well after the relevant events in this case had occurred. (Ex. 2.) In any event, CBC wasn't fooled a bit. The documents signed by Calabrese as "Owner" did not for one moment pull the wool over CBC's corporate eyes. Those eyes remained wide open to everything except the requirements of the listing statute.
Relying on its listing agreement, CBC negotiated a lease between Calabrese and Exmet. The lease was executed on August 25, 1988. On September 27, as just mentioned, Calabrese signed an agreement with Naugatuck to purchase the property. On October 11, 1988, he purchased it. (Ex. 3.) Calabrese thus acquired ownership, as an individual, approximately a month and a half after the CT Page 2554 lease was negotiated and signed. The Calabrese Development Corporation has never been an owner at any time.
The commission owed under the listing agreement, as calculated by CBC, is $48,307.50. Calabrese paid CBC $19,000 of this amount in checks dated August 14, 1989, September 28, 1989, and June 13, 1990. (Ex. D.) On February 7, 1990, and January 10, 1991, Calabrese wrote CBC letters promising to pay the balance. (Ex. I J.) But Calabrese was experiencing financial problems and decided to talk with his lawyer. His lawyer, mirabile dictu, told him that he didn't owe a penny. His lawyer was right.
"The right of a real estate broker to recover a commission is dependent upon whether the listing agreement meets the requirements of 20-325a(b)." McCutcheon Burr, Inc. v. Berman,218 Conn. 512, 519, 590 A.2d 438 (1991). CBC claims that because the listing agreement here was between a non-owner and a broker the statute is inapplicable, but this position cannot be squared with the plain words of the statute itself. The statute applies to any action brought by a licensed real estate broker "to recover any commission, compensation, or other payment in respect of any act done or service rendered by him, the doing or rendering of which is prohibited under the provisions of this chapter except by persons duly licensed under this chapter." Conn. Gen. Stat.20-325a(a). A "real estate broker" is, along other things, "any person. . .or corporation which, for another and for a fee, commission, or other valuable consideration. . .rents, or offers or attempts to negotiate a. . .rental of an estate or interest in real estate." Conn. Gen. Stat. 20-311(1).
This language fairly describes the actions of CBC in this case. It undertook, by a listing agreement, to negotiate the rental of real property for another. (Cases that CBC cites involving contracts other than listing agreements, such as the sales contract in William Pitt, Inc. v. Taylor, 186 Conn. 82,438 A.2d 1206 (1982), have no bearing on this case — CBC is obviously relying upon a listing agreement here.) The statutory term "for another" in 20-311(1) is, manifestly, a broad one. If the legislature had intended it to read "for an owner" it could have easily said so. The unambiguous language of this statute, read with the listing statute, establishes that the listing statute applies to listing agreements with owners and non-owners alike. This reading is, in any event, made necessary by McCutcheon 
Burr, supra. That case, described in some detail below, involved a listing agreement between a broker and a partnership that turned CT Page 2555 out to be a non-owner. The Supreme Court found the listing statute to be applicable and invalidated the agreement. In light of this holding, the earlier Superior Court cases relied upon by CBC that reach a different result — Eulau v. Charter House Realty, 6 Conn. Super. Ct. Rep. 129 (1990) and Cushman Wakefield of Connecticut, Inc. v. Weston Group Inc., 2 Conn. Super. Ct. Rep. 339 (1987) — must now be regarded as wrongly decided. (Yet another case relied upon by CBC, Investors Mortgage Co. v. Jessco, Inc., 6 Conn. Cir. Ct. 445, 275 A.2d 287 (1970), was decided at a time when the statutory text did not require listing agreements to be signed by owners in the first place.)
20-325a(b)(5) requires that a listing agreement, to be effective, must "be signed by the owner or an agent authorized to act on behalf of the owner." The legislative history of this provision is instructive. The listing statute originally required listing agreements to "be signed by the parties thereto." 1971 Conn. Pub. Acts 378 2(5). In 1984, this was changed so as to require listing agreements to "be signed by the seller or his agent." 1984 Conn. Acts 84-137. The 1984 act, however, caused problems in the very area involved in this case, viz. broker services not involving the sale of property. A person wishing to use a broker to lease an apartment, for example, would find herself in a legal neverland under the 1984 act since there was no "seller" involved. Conn. Joint Standing Committee Hearings, Insurance and Real Estate, 1985 Sess., p. 71 (testimony of Larry Hannafin, Director, Real Estate Division, Department of Consumer Protection). So the legislature once again put its shoulder to the wheel and passed 1985 Conn. Acts 85-166, which requires a listing agreement to "be signed by the owner or an agent authorized to act on behalf of the owner." This was intended to be "very clear language [as to] who will sign and who won't." 28 S. Proc., Pt. 5, 1985 Sess., p. 1557 (statement of Sen. Schoolcraft). This "very clear language" was in effect at the time of all relevant events in this case and remains in effect today.
To some extent, of course, "[t]he word owner is one of flexible meaning." Hope v. Cavallo, 163 Conn. 576, 580-81,316 A.2d 407 (1972). "[I]t varies from an absolute proprietary interest to a mere possessory right." Id. at 581. Even someone who has contracted for the purchase of a property at a stipulated price in the future may under some circumstances be regarded as the equitable owner, although the bare legal title is still vested in the seller. Hough v. City Fire Insurance Co., 29 Conn. 10,19-20 (1860). Hough, however, must be regarded as the high-water CT Page 2556 mark of the flexible ownership doctrine. Someone who hopes to purchase a piece of property but who has not yet signed an option contract or a purchase contract cannot, even with the most elastic use of language, be regarded as that property's owner.
Nevertheless, some early Superior Court cases construing the 1985 act took an exceedingly broad approach and held that a person acquiring title after the execution of a listing agreement can be construed as an "owner." Kenney Realty Company, Inc. v. Baptie,3 Conn. L. Rptr. 532 (1990); Realty World-Settani Associates, Inc. v. Pelletier, 3 Conn. Super. Ct. Rep. 327 (1988). (It is unclear from the reports of these cases whether purchase agreements existed at the time of execution.) These cases, however, cannot survive the Connecticut Supreme Court's 1991 decision in McCutcheon Burr, Inc. v. Berman, supra.
McCutcheon Burr involved a listing agreement to sell real property that was owned by three individuals. The listing agreement, however, was signed by only one of these individuals, and he signed in the name of a partnership. The Supreme Court held that no commission could be recovered, in spite of the fact that the individual owners had, in fact, been acting as partners. The court stated that "the requirements of 20-325a(b) are mandatory rather than permissive and. . .the statute is to be strictly construed." 218 Conn. at 520. It concluded that, "`owner,' as used in 20-325a(b), means the record owner or owners as displayed on the land records." Id. at 522. It further stated that, "[T]he overarching purpose of the [1985] amendment was to clarify the statutory language in order to make the statute effective and workable. . . .Interpreting the word `owner' to mean `record owner' advances this purpose because a broker can determine who must sign a listing agreement through the simple expedient of examining the land records." Id. at 523 n. 12.
Of course, the plaintiff here did not even have to resort to "the simple expedient of examining the land records." CBC knew who the owner was all along — it just thought that it was unnecessary to obtain the owner's signature. The clear language of the statute, however, is to the contrary. Indeed, even if CBC had been misled by Calabrese's signature as "owner" on the listing agreement — which it was not — it would still be without recourse since, "There is no provision in the statute allowing for the language of the listing agreement to free the broker from using due diligence to ensure that the information included in the listing is accurate." Real Estate Auctions, Inc. v. Senie, 28 Conn. App. 563, CT Page 2557 570, 611 A.2d 452 (1992).
This analysis is not altered by the fact that Calabrese made partial payment on the broker's fee and agreed to pay the balance after he had acquired title to the property. This has no more effect in reviving the defective listing agreement here than did the fact that the signing partner in McCutcheon Burr acquired authority to sign after the execution of the fatally defective listing agreement in that case. 218 Conn. at 522 n. 11. The listing statute plainly contemplates, at a minimum, that a valid "writing must precipitate the services. The services cannot precipitate the writing." Seaman v. King Arthur Court, Inc.,35 Conn. Sup. 220, 223, 404 A.2d 908 (1979).
This is, admittedly, a somewhat troublesome conclusion to reach. The listing statute was enacted to protect consumers from unscrupulous brokers, and here, if anything, it is the broker that needs to be protected from an unscrupulous consumer. But this is a case controlled by statutory law, and if the statutory text is plain and unambiguous, the court can go no further. Sanzone v. Board of Police Commissioners 219 Conn. 179, 187, 592 A.2d 912
(1991). "The controlling principle in this case is the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written." Estate of Cowart v. Niclos Drilling Co., 112 S.Ct. 2589, 2594 (1992). The statutory text itself determines what is and is not an unjust result. Hudson House Condominium Association, Inc. v. Brooks, 223 Conn. 610, 615
(1992). This makes some rough sense in the commercial real estate field because the statute provides a measure of certainty, and "[t]hose engaged in real property transactions ordinarily desire certainty in their financial dealings." Phillippe v. Shapell Industries, Inc., 43 Cal.3d 1247, 743 P.2d 1279, 1291 (1987).
Of course, in all likelihood, the legislature never anticipated the scenario before the court in this case, but while this provides some reason for hope that the legislature will once again look at the statute, it cannot provide an avenue for escape from the statute's present clear and express words. Society requires its judges to administer justice within certain rules and guidelines, and there are limits beyond which judges simply may not go. "We do not sit like a kadi under a tree dispensing justice according to considerations of individual expediency." Terminiello v. City of Chicago, 337 U.S. 1, 11 (1949) (Frankfurter, J., dissenting).
For the reasons discussed above, CBC's first count, alleging CT Page 2558 breach of contract, cannot be sustained. CBC's second count, alleging intentional misrepresentation, must meet a similar fate. It is far from clear that such a cause of action can even be maintained independently of the statute, since the statute pre-empts the field and is to be strictly construed. Real Estate Auctions, Inc. v. Senie, supra, 28 Conn. App. at 570. But even if the cause of action is theoretically viable, it cannot be maintained here because of the fact, found by the court, that CBC was not misled by Calabrese in the slightest degree. It knew all along that the property was owned by Naugatuck. "It is essential in an action based upon a false or fraudulent representation that the person claiming relief must establish not only that a false or fraudulent representation was made but also that he believed the statement to be true and in fact relied on it." City Trust Co. v. Jennings,158 Conn. 173, 178, 258 A.2d 85 (1969).
Judgment shall enter for the defendants.
Dated at Waterbury this 11th day of March, 1993.
JON C. BLUE Judge of the Superior Court