[No. G045872. Fourth Dist., Div. Three. Dec. 19, 2012.]

BARNES, CROSBY, FITZGERALD & ZEMAN, LLP, Plaintiff and Appellant, v.
JEROME L. RINGLER et al., Defendants and Respondents.

## COUNSEL

Enterprise Counsel Group, David A. Robinson, Benjamin P. Pugh, James S. Azadian and Jonathan J. Boustani for Plaintiff and Appellant.

Lindahl Beck, George M. Lindahl and Alan D. Mehaffey for Defendants and Respondents.

## OPINION

**IKOLA, J.**—In class actions, an attorney's agreement to share legal fees is governed by the State Bar Rules of Professional Conduct, rule 2-200 (rule

2-200) and California Rules of Court, rule 3.769 (rule 3.769). Rule 2-200 permits an attorney to share legal fees with another lawyer only with the client's informed, written consent. Rule 3.769 requires an applicant seeking court approval of a class action settlement to inform the court of any fee-sharing agreement.

In this case, we hold that an attorney may be equitably estopped from claiming that a fee-sharing contract is unenforceable due to noncompliance with rule 2-200 or rule 3.769, where that attorney is responsible for such noncompliance and has unfairly prevented another lawyer from complying with the rules' mandates.

## FACTS[1]

*The Complaint*

Plaintiff Barnes, Crosby, Fitzgerald & Zeman, LLP, filed its operative complaint for declaratory relief against defendants Jerome L. Ringler, his law firm Ringler, Kearney & Alvarez, LLP (RKA), and McNicholas & McNicholas, LLP (M&M). The complaint alleged, inter alia, that in 2004 or 2005, plaintiff referred to Ringler a potential class action suit against RSM EquiCo, Inc. (EquiCo). At the time, Ringler was a class action specialist at the law firm of Robins, Kaplan, Miller & Ciresi, LLP (Robins). In a December 2005 written agreement, Ringler promised to pay plaintiff one-third of any legal fees recovered. Two months later, Ringler left Robins and formed his own law firm, RKA. In February 2006, Ringler confirmed to plaintiff in writing that RKA would honor the prior fee-splitting agreement. In July 2006, RKA and M&M filed the class action originally proposed by plaintiff. RKA and M&M agreed between themselves to " 'share on a 50-50 basis any and all referral fees to other attorneys' " in the class action. For over three years, defendants led plaintiff to believe that defendants would honor the fee-splitting agreement. In April 2009, defendants obtained court certification of the class, using information obtained from plaintiff. In May 2009, Ringler informed plaintiff that although plaintiff had referred the EquiCo matter to him, Ringler had learned that plaintiff had signed a nondisclosure agreement with EquiCo which, in Ringler's view, posed a potential " 'risk, however de minimis, that . . . might somehow compromise [Ringler's] representation of the class . . . .' " Ringler refused to disclose the fee-splitting agreement to the class representatives or the court because the fee division was no " 'longer contemplated.' " Because plaintiff was not in direct contact or privity with the

---

[1] We granted the parties' respective requests for judicial notice of certain pleadings and records in this case, including the trial court's approval of a $13.5 million attorney fee payment to the defendants in the underlying class action. Plaintiff also incorporated by reference documents from a prior writ proceeding in this case. (Cal. Rules of Court, rule 8.124(b)(2).)

class representatives, defendants "had the exclusive means and opportunity to" disclose the fee-splitting agreement to the class and the court. Defendants threatened that if plaintiff tried to notify the class representatives of the fee-splitting agreement, defendants would consider such action to be tortious interference with defendants' attorney-client relationship. Finally, plaintiff alleged the fee-splitting agreement did not contemplate any increase in the total legal fees charged to the class.

In its prayer for relief, plaintiff asked the court to declare, inter alia, (1) whether a fee-splitting agreement existed between plaintiff and defendants, (2) whether defendants had a duty to inform the court and the class representatives of the fee-splitting agreement, (3) whether defendants were entitled to rely on their own wrongdoing and noncompliance with disclosure rules as a defense to the enforcement of their fee-splitting commitment, and (4) whether, given defendants' lack of compliance with their duties, plaintiffs now had the right to directly inform the court and the class representatives of the fee-splitting agreement.

*The Summary Judgment Motion*

Defendants moved for summary judgment on the ground that the class representatives had "already been made aware of and refused to consent to any fee-splitting agreement between Plaintiff and Defendants." Plaintiff disputed defendants' assertion, arguing there was no evidence defendants had disclosed to the class representatives that (1) a written fee-splitting agreement existed; (2) the agreement would not increase the amount of attorney fees charged or collected; and (3) the agreement would not change the class's current legal representation.

Judge Thierry Patrick Colaw denied defendants' summary judgment motion. The court found a triable issue of material fact existed "as to whether Defendants' purported disclosure of the fee-splitting agreement to the *RSM EquiCo* class action plaintiffs was sufficient under" rule 2-200. The court also noted defendants had provided "no legal authority to support their argument that [rule] 2-200 trumps the court's authority granted by [rule] 3.769 to determine attorney fee awards . . . ."

*The Trial*

In a bench trial before Judge Kim Garlin Dunning, the attorneys gave their opening statements. In plaintiff's counsel's opening statement, he summarized the operative complaint's allegations, as well as the following additional

ones. In the fall of 2005, plaintiff referred a client, Cordell Meredith (a disgruntled EquiCo client), to Ringler as "the proposed" class representative; *Meredith consented in writing to the referral fee*; in October 2005, Ringler e-mailed plaintiff that his office would "move forward with a class action against EquiCo" only if the referral fee was one-third or another sum acceptable to plaintiff; Robins (Ringler's then law firm) filed an individual action on behalf of Meredith against EquiCo, but reserved the right to turn the *Meredith* lawsuit into a class action; and plaintiff provided Ringler with a list of disgruntled former clients of EquiCo.

After Ringler started his new firm (RKA), plaintiff (to ensure that RKA had sufficient funding and staffing to handle the class action) acted as the "matchmaker" to obtain the agreement of Patrick McNicholas (of M&M) to participate in and invest in the class action. McNicholas was aware of the one-third referral fee to plaintiff.

In February 2006, Ringler's former law firm (Robins) filed a lien in the *Meredith* lawsuit.

In March 2006, plaintiff settled a wrongful termination claim against EquiCo by a whistleblower employee and signed a nondisclosure agreement. The nondisclosure agreement was prospective in effect, i.e., it could only operate to prohibit plaintiff from making any future disclosures.[2] The information plaintiff provided defendants for the class action "occurred before" the nondisclosure agreement went into effect.

In June 2006, Ringler informed Cordell Meredith, without explanation, that Ringler would no longer act as Meredith's attorney and referred Meredith to another lawyer. One month later, Ringler filed the *"Do Right"*[3] class action that "was basically a cookie cutter of the prior work product," and named class representatives originally identified by plaintiff in the list of disgruntled former EquiCo clients. (Plaintiff's counsel stated the evidence would show defendants filed a new lawsuit, rather than converting the *Meredith* case into a class action, due to Robins's lien on the *Meredith* action.) The *Meredith* action was ultimately dismissed with a stipulation that Cordell Meredith "would be regarded as a member of the class" in the *Do Right* class action.[4]

---

[2] In a deposition, Ringler agreed that the nondisclosure agreement applied only prospectively.

[3] *Do Right's Plant Growers v. RSM EquiCo, Inc.* (Super. Ct. Orange County, 2011, No. 06CC00137).

[4] As a result of defendants filing a new class action, rather than converting the *Meredith* lawsuit into a class action, Cordell Meredith and over 200 potential class members were eventually dismissed from the class because Ringler contended their claims were barred by the statute of limitations.

In October 2006, RKA and M&M agreed to "share on a 50/50 basis any . . . referral fees to other attorneys." Throughout 2008, plaintiff repeatedly asked Ringler when and how he planned to inform the court and the new class representatives of the fee-sharing agreement. Ringler repeatedly replied that the time was not right, but he would take care of it.

On August 4, 2008, Ringler raised a concern that plaintiff might have a conflict of interest due to its prior representation of the EquiCo whistleblower employee. Ringler stated the problem would be resolved if plaintiff obtained conflict waivers; therefore, plaintiff sent Ringler draft conflict letters for Ringler's review, but never heard back from him. Nonetheless, on August 22, 2008, Ringler assured plaintiff that RKA and M&M would honor the referral fee agreement.

In January 2009, Ringler and McNicholas informed plaintiff they would *not* honor the referral fee agreement. Ringler informed plaintiff's counsel that "there is no requirement that the court be apprised of any purported agreement with your clients."

In defense counsel's opening statement, he did "not disput[e] a lot of this factual background." Instead, he stressed that the two class representatives in the *Do Right* class action had not consented in writing to the fee-sharing agreement. He argued the case law was clear that the contract was therefore unenforceable under rule 2-200. He concluded there was "no referral fee agreement for [plaintiff] to enforce," and therefore "no declaratory relief can be provided, let alone enforcement of a clearly nonexistent referral fee agreement."

*The Court's Ruling and Judgment*

After counsel completed their opening statements, the court asked, "Does it make sense for the court to make a ruling before we get too far into this as to the applicability of rule[s] 2-200 and 3.769?" The attorneys agreed and submitted on the issue of the applicability of rule 2-200. Plaintiff's counsel stated he planned to present evidence to support an equitable estoppel argument. The court stated the evidence was relevant only "if equitable estoppel is an available" remedy for plaintiff.

The next morning, the court entered judgment for defendants. The court ruled as a matter of law that the parties' noncompliance with rule 2-200

rendered the referral fee agreement nonexistent. The court clarified it was "not a question of [plaintiff] not presenting enough facts." Nor was there an issue of noncompliance with rule 3.769, since Judge Dunning (who was also presiding over the *Do Right* class action) had "ample notice" of the fee agreement. Rather, the court stated it could not notify the class representatives or advise in a notice of settlement of the class action "that there is a fee-splitting agreement," because the fee agreement did not exist. "Unless there is an agreement that can be enforced, there is nothing for the court to give notice of in the class action under rule 3.769." "[W]ithout signatures from the class representatives, there is no agreement under rule 2-200." Furthermore, the court, relying on *Chambers v. Kay* (2002) 29 Cal.4th 142 [126 Cal.Rptr.2d 536, 56 P.3d 645] (*Chambers*) and *Margolin v. Shemaria* (2000) 85 Cal.App.4th 891 [102 Cal.Rptr.2d 502] (*Margolin*), stated equitable estoppel was inapplicable because (1) there was no unconscionable injury to plaintiff since it assumed the risk the other attorney would not keep a promise to comply with rule 2-200 and (2) defendants were not unjustly enriched because rule 2-200 exists for the benefit of clients, not attorneys. The court noted that "one of the common denominators of all of the cases that discuss rule 2-200 is that there was an attorney-client relationship between the client and the attorney who made the referral," whereas here, the parties had stipulated that plaintiff had no attorney-client relationship with the class representatives in the *Do Right* class action.

When plaintiff's counsel asked the court for a declaration that Ringler had a duty to disclose the agreement to the class representatives, the court reiterated that, as a matter of law "rule 2-200 requires written disclosure and written consent by the client. Here, there is no written disclosure to the client, no written consent by the client. So under rule 2-200, there is no agreement." The court repeated, "[H]ere we have no privity with the client. We have no compliance with rule 2-200. We have no agreement." "If there is no agreement, there is nothing to enforce." "If there is no agreement, there is no duty to give notice of something that doesn't exist."

The written judgment stated the court "held that rule 2-200 . . . applied and found no fee-referral or fee-splitting agreement existed in the" *Do Right* class action and ruled in defendant's favor on plaintiff's declaratory relief cause of action.

Plaintiff petitioned this court for a writ of mandate, which we summarily denied.

The court subsequently approved the settlement of the *Do Right* class action, including attorney fees of $13.5 million.

## DISCUSSION

*Standard of Review*

■ The judgment in this case arose from a unique procedure. Although summary judgment had been denied, when the matter came on for trial, the court granted judgment for defendant after hearing the parties' opening statements and without the benefit of any evidence. We have encountered a similar procedure before. In *Stein-Brief Group, Inc. v. Home Indemnity Co.* (1998) 65 Cal.App.4th 364 [76 Cal.Rptr.2d 3], an insurance coverage case, the trial court was presented with cross-motions in limine. (*Id.* at p. 368.) There, the trial court adopted an "unusual and unorthodox procedure" and ordered the plaintiff "to set forth the facts most favorable to its case, which the court would assume as true, and then entertained legal arguments from both sides on the question of coverage." (*Id.* at p. 369.) After pointing out that this procedure was an inappropriate use of the motion in limine, we held, "This is more in the nature of a motion for nonsuit, or demurrer to the evidence." (*Ibid.*) Analogizing the procedure to a nonsuit, we applied the standard of review appropriate to the review of orders granting nonsuit: "We ' "must accept all facts asserted in the opening statement . . . as true and must indulge every legitimate inference which may be drawn from those facts." ' " (*Ibid.*) "We independently review an order granting a nonsuit, evaluating the [proffered] evidence in the light most favorable to the plaintiff and resolving all presumptions, inferences and doubts in [its] favor." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1124 [76 Cal.Rptr.3d 585].)

Because this case also involves the interpretation of rule 2-200, our standard of review on this issue is also de novo. (*Margolin, supra,* 85 Cal.App.4th at p. 895.)

*Under the Unique Circumstances of This Case, the Parties' Noncompliance with Rule 2-200 Does Not Preclude Plaintiff from Enforcing the Referral Fee Agreement*

Defendants frame the issue here as "a simple question of law: May a lawyer seek to enforce a purported fee-splitting agreement against another lawyer when there has been no client consent to the agreement as mandated by [rule] 2-200? Under an unbroken line of California precedent, the answer to this question is a resounding, unequivocal 'no.' "

The case before us, however, presents a critical distinction from the "unbroken" line of precedent on which defendants rely. Here, plaintiff offered to prove that defendants *wrongfully prevented* it from obtaining client consent. Specifically, plaintiff offered to prove that defendants changed the named class representatives in a class action suit—that is, made "a calculated switch of clients"—in order to use rule 2-200 "as a 'sword' to escape a written referral fee agreement approved by the originally referred proposed class action representatives."

Thus, this case implicates disclosure and consent requirements set forth in two rules: (1) rule 2-200, applicable to all fee-sharing agreements, and (2) rule 3.769, applicable to fee-splitting contracts in class actions. We discuss rule 2-200 as it has been interpreted and applied in relevant case law before turning to a similar discussion of rule 3.769.

1. *Rule 2-200,* Chambers, Margolin, *and Other Disclosure Requirements*

Rule 2-200 provides in relevant part: "A member shall not divide a fee for legal services with a lawyer who is not a partner of, associate of, or shareholder with the member unless: [¶] (1) The client has consented in writing thereto after a full disclosure has been made in writing that a division of fees will be made and the terms of such division; and [¶] (2) The total fee charged by all lawyers is not increased solely by reason of the provision for division of fees and is not unconscionable . . . ."

The purpose of rule 2-200 is to protect clients from their attorneys' potential conflicts of interest created by fee-sharing agreements. (*Mark v. Spencer* (2008) 166 Cal.App.4th 219, 227 [82 Cal.Rptr.3d 569] (*Mark*).) Such agreements have the potential to motivate an attorney to charge excessive fees or to make tactical decisions unfavorable to the client's interests. (*Ibid.*) Rule 2-200 alleviates these risks by requiring the attorneys to disclose, and obtain the client's written consent to, the fee-sharing arrangement. "Such information may affect the client's level of confidence in the attorneys and is indispensable to the client's ability to make an informed decision regarding whether to accept the fee division and whether to retain or discharge a particular attorney." (*Chambers, supra,* 29 Cal.4th at p. 157.) In this way, rule 2-200 protects the public and promotes confidence in the legal profession. (*Chambers,* at p. 158.)

"[R]ule 2-200 does not specify any penalty for its violation . . . ." (*Mark, supra,* 166 Cal.App.4th at p. 226.) But, as with all Rules of Professional Conduct, violation of rule 2-200 can subject an attorney to disciplinary action by the State Bar. (Rules Prof. Conduct, rule 1-100(A); *Margolin, supra,* 85 Cal.App.4th at p. 894, fn. 2.)

Rule 2-200, however, creates no independent grounds for recovery by a third party, such as a client or another lawyer. The rule creates no new civil causes of action nor does it affect the "substantive legal duty of lawyers or the non-disciplinary consequences of violating such a duty." (Rules Prof. Conduct, rule 1-100(A).) Nonetheless, independently of rule 2-200, under the Business and Professions Code and the Rules of Professional Conduct, attorneys have a legal duty to " 'keep a client reasonably informed about significant developments relating to the employment or representation . . . .' " (*Chambers, supra*, 29 Cal.4th at p. 157; see Bus. & Prof. Code, § 6068, subd. (m); Rules Prof. Conduct, rule 3-500.)

Besides potential disciplinary action, case law has created another penalty for noncompliance with rule 2-200 (and a strong motivator for attorneys to adhere to the rule's mandates): a noncompliant agreement generally cannot be enforced by an attorney. *Chambers*, *Margolin*, and *Mark* uniformly recognize that an attorney cannot enforce a fee-sharing agreement if that attorney could have obtained written client consent as required by rule 2-200, but failed to do so.

In *Margolin*, the plaintiff attorneys learned from their client (the wife in a family law case) of a potential tort suit against the client's husband. (*Margolin, supra*, 85 Cal.App.4th at p. 896.) The plaintiffs referred the case to the defendant attorney. The defendant agreed to obtain the client's written consent to the referral agreement. (*Ibid.*) The client orally consented to the division of fees, but never did so in writing. (*Id.* at pp. 896–897.) After the defendant recovered legal fees in the tort action but paid the plaintiffs nothing (*id.* at p. 897), the plaintiffs sued the defendant for breach of contract (*id.* at p. 893). The trial court granted the defendant "a directed verdict, finding that plaintiffs do not have a *viable* contract with [the defendant] for fee sharing because the contract does not comply with" rule 2-200. (*Margolin*, at p. 894.)

The Court of Appeal affirmed the judgment, finding the trial court properly applied rule 2-200 to deny the plaintiffs any recovery under the referral agreement. (*Margolin, supra*, 85 Cal.App.4th at p. 894.) The plaintiffs had no "right to insist that [the defendant] violate rule 2-200 (and thereby subject himself to possible disciplinary action by the State Bar of California) so that they can receive the benefit of their bargain with him." (*Ibid.*) Nor was "equitable estoppel . . . available to plaintiffs to overcome [the defendant's] assertion of rule 2-200 as a defense . . . ." (*Id.* at p. 901.) The plaintiffs' reliance on the defendant's promise to obtain the client's written consent

"was not sufficiently reasonable to afford plaintiffs relief from the requirements of rule 2-200." (*Ibid.*) "Plaintiffs could have protected themselves *by providing wife with the required written fee-sharing disclosure and obtaining her written consent.*" (*Id.* at p. 902, italics added.) In a footnote, *Margolin* recognized that, under some circumstances, equitable estoppel protection might be available to an attorney who reasonably relied on another lawyer's promise to obtain written client consent. (*Id.* at p. 903, fn. 7.)[5]

■ *Margolin* relied heavily "on the Supreme Court's thoughtful analysis" in *Phillippe v. Shapell Industries* (1987) 43 Cal.3d 1247 [241 Cal.Rptr. 22, 743 P.2d 1279]. (*Margolin, supra,* 85 Cal.App.4th at p. 899.) In *Phillippe,* a licensed real estate broker sought to recover a broker's commission from a client, even though the broker had failed to obtain a written commission agreement required under the statute of frauds. (*Phillippe,* at p. 1252.) The broker argued that the client "should be estopped from asserting the statute of frauds as a defense" because the client had made an oral promise to pay the commission. (*Id.* at p. 1259.) Our Supreme Court held "that a licensed real estate broker cannot invoke equitable estoppel to avoid the statute of frauds unless the broker shows actual fraud." (*Id.* at p. 1252.) "To give rise to equitable estoppel, the promisee's reliance must be reasonable." (*Id.* at p. 1262.) The plaintiff, a licensed real estate broker presumed to know about the statute of frauds, unreasonably relied on the client's oral promise. (*Id.* at p. 1261.) " 'The plaintiff, a man of experience in this line of business, *knew how to protect himself in the transaction but failed to do so.*' " (*Ibid.,* italics added.)

In *Chambers,* our Supreme Court held that rule 2-200 precluded the plaintiff attorney from recovering fees under a fee-sharing contract to which the client had not consented in writing. (*Chambers, supra,* 29 Cal.4th at p. 145.) *Chambers* stated, "Were we to hold that the fee . . . may be divided as [the attorneys] agreed, *with no indication that the required client consent was either sought or given,* we would, in effect, be both countenancing and contributing to a violation of a rule we formally approved in order 'to protect the public and to promote respect and confidence in the legal profession.' " (*Id.* at p. 158, italics added.)

---

[5] *Margolin* stated in footnote 7, "By this opinion, we do not decide whether we would refuse to apply the doctrine of equitable estoppel in a situation where the attorney seeking to enforce a fee-sharing agreement that does not comply with rule 2-200 is the attorney *to whom* the case was referred, since such an attorney would be the one that did most or all the work on the case and reliance on the assurances of referring counsel (who necessarily has the original client relationship) might well be reasonable." (*Margolin, supra,* 85 Cal.App.4th at p. 903, fn. 7.)

*Chambers* cited *Margolin* with approval (*Chambers, supra*, 29 Cal.4th at pp. 156–157), and explained that *Margolin* denied the plaintiffs relief under equitable estoppel principles "because the *plaintiffs could have protected themselves by providing the client with the required written fee-sharing disclosure and obtaining her consent*" (*Chambers*, at pp. 158–159, italics added). The plaintiff in *Chambers* argued that enforcing the fee-sharing contract despite the lack of written client consent "would effectuate the intent of the contracting attorneys and would avoid incentives for fraud in the inducement of such contracts." (*Id.* at p. 159.) Our Supreme Court stated, "[B]ecause *attorneys are fully capable of safeguarding their own interests simply by obtaining the requisite client consent*, we are not persuaded that Chambers's proffered reasons are sufficient to disregard rule 2-200's command." (*Ibid.*, italics added.) *Chambers* concluded, "Although [the plaintiff] complains that [the defendant] should not be permitted to take advantage of his own disregard of the Rules of Professional Conduct, we are not persuaded that this circumstance justifies or otherwise excuses [*the plaintiff's*] *equally disturbing neglect of rule 2-200* and the policy considerations that motivated its adoption. [*The plaintiff*] *could have protected his interests, and at the same time fulfilled the beneficial purposes of the rule and acted in* [*the client's*] *best interests, by requesting proof of her written consent to the fee division before committing himself to her case.*" (*Id.* at pp. 162–163, italics added.)

Neither *Chambers* nor *Margolin* involved class actions. Rather, they involved circumstances where the plaintiff attorneys had attorney-client relationships with the respective clients, and could have protected their right to an agreed division of fees by directly asking the clients for written consent. In *Margolin*, the plaintiffs referred their client to the defendant. (*Margolin, supra*, 85 Cal.App.4th at p. 896.) And in *Chambers*, the plaintiff was cocounsel representing the client at one point in time. (*Chambers, supra*, 29 Cal.4th at p. 146.)

The case before us involves a class action. Plaintiff argues, "Unlike the situations known to exist in every other published Rule 2-200 decision to date, [defendants]—the class-action specialists who accepted this particular class action referral—were in a position to manufacture non-compliance with this consumer protection law by switching clients."

We turn to rule 3.769 and *Mark, supra*, 166 Cal.App.4th 219, in which this court discussed the application of *Chambers*, rule 2-200, and rule 3.769 in a class action.

## 2. *Rule 3.769 and* Mark

Under rule 3.769(a), a settlement of a class action "requires the approval of the court after hearing." Under rule 3.769(b), any attorney fee agreement, express or implied, must be set forth in full in the application for court approval. Under rule 3.769(f), the court must give notice of the final approval hearing to the class members. The "notice must contain an explanation of the proposed settlement and procedures for class members to follow in filing written objections to it and in arranging to appear at the settlement hearing and state any objections to the proposed settlement." (*Ibid.*)

The purpose of rule 3.769(b) is to protect class members (including absent ones) from their attorneys' potential conflicts of interest. (*Mark, supra*, 166 Cal.App.4th at p. 228.) "[A]ttorneys' representation of absent class members in settlement negotiations . . . creates an increased potential for a conflict of interest." (*Id.* at p. 227.) In a class action, " '*full disclosure and consent are many times difficult and frequently impractical to obtain.*' " (*Ibid.*) "Because absent class members are not directly involved in the proceedings, oversight to ensure settlements are fair and untainted by conflict is the responsibility of both the class representative *and the court.*" (*Ibid.*) "To fulfill its role in protecting absent class members, the class action court must consider the potential effect of a fee-splitting agreement *before* approving a proposed settlement." (*Ibid.*) "In reviewing an attorney fee provision in a class action settlement agreement, the trial court has an independent duty to determine the reasonableness of the award." (*Cellphone Termination Fee Cases* (2009) 180 Cal.App.4th 1110, 1119 [104 Cal.Rptr.3d 275].) The class attorneys must ensure the court has all the facts in reviewing a fee application. (*In re Agent Orange Product Liability Litigation* (2d Cir. 1987) 818 F.2d 216, 223.) In addition, the class attorneys have a fiduciary duty to the class " 'not to overreach.' " (*Ibid.*)

In *Mark*, an attorney complied with rule 2-200 by obtaining written client consent (*Mark, supra*, 166 Cal.App.4th at p. 227), but then failed to disclose the fee arrangement to the court at the hearing for court approval of the class action settlement and the fee award (*id.* at p. 224). The court awarded the attorney a lower percentage of the fees than was specified in his fee-splitting agreement with cocounsel. (*Ibid.*)

The attorney then sued his cocounsel for breach of contract. (*Mark, supra*, 166 Cal.App.4th at p. 224.) The trial court entered judgment for the defendant due to the plaintiff's noncompliance with the predecessor rule to rule 3.769. (*Mark*, at p. 225.) We affirmed the judgment, holding that the plaintiff's failure to comply with the disclosure requirements of rule 3.769 barred him from enforcing the fee-splitting contract. (*Mark*, at p. 225.) We explained:

"Rule 3.769 was designed to protect class members from potential conflicts of interest with their attorneys by requiring the full disclosure of all fee agreements in any application for dismissal or settlement of a class action. Rule 3.769 would be effectively nullified if attorneys could conceal a fee-splitting agreement from the court in seeking approval of a class action settlement and later enforce the agreement in a separate action." (*Id.* at p. 223.) We observed that the Supreme Court in *Chambers, supra*, 29 Cal.4th 142, had recognized that the plaintiff there "could have taken steps to both protect his interests and fulfill the purposes of" rule 2-200. (*Mark*, at p. 227.) So, too, the plaintiff in *Mark* had violated rule 3.769 by failing to disclose the fee-splitting agreement to the court. (*Mark*, at p. 229.)

### 3. *The Case Before Us*

Here, plaintiff's complaint asked the court to declare whether a valid fee-splitting agreement existed; whether defendants had a duty to inform the court and the class representatives of the agreement and to obtain the class representatives' consent; whether defendants could rely on their own wrong-doing to avoid sharing fees with plaintiff; and whether plaintiff could directly inform the court and the class representatives of the agreement to prevent a waiver or forfeiture of plaintiff's rights.

The court entered judgment in defendants' favor, ruling as a matter of law that a fee-splitting agreement that does not comply with rule 2-200 simply does not exist.

We must disagree with the court's legal conclusion that noncompliance with rule 2-200 renders a fee-sharing agreement nonexistent, as opposed to potentially unenforceable by an attorney. As plaintiff argues, the court's reasoning is circular: "[T]he trial court concluded that the only time class action attorneys must inform their client(s) of the existence of a referral fee agreement is after the client(s) have already approved the referral fee agreement."

Moreover, the court's reasoning would undercut the purposes of rules 2-200 and 3.769, as well as Business and Professions Code section 6068, subdivision (m) and Rules of Professional Conduct, rule 3-500. It would allow attorneys to evade statutory and regulatory disclosure mandates simply by violating rule 2-200 and thereby rendering the contract nonexistent.

Furthermore, the court's reasoning would have a dampening effect on attorney referrals. An attorney would be less likely to refer a class action to a specialist lawyer if the specialist could invalidate the referral fee agreement simply by switching class representatives. Such a result would be detrimental

to the public and would weaken confidence in the legal profession. Clients benefit from "referrals by 'less capable lawyers to . . . experienced specialists . . . .' " (*Margolin, supra,* 85 Cal.App.4th at p. 894, fn. 2.)

Here, plaintiff offered to prove that it tried to comply with rules 2-200 and 3.769, but that defendants prevented it from doing so. Plaintiff obtained Cordell Meredith's written consent to the referral fee. But defendants had effectively replaced Meredith with new class representatives. Defendants threatened to bring a tort lawsuit if plaintiff contacted the new representatives.

Plaintiff was left with few alternatives. To ensure the contract was disclosed to the class representatives and absent class members, it asked the court to determine whether the fee-splitting contract applied to the *Do Right* class action and, if so, to declare that defendants bore a duty to disclose the contract to the clients. But the court declined to address the factual question of whether the fee-splitting contract applied to the *Do Right* class action and instead interpreted rule 2-200 to foreclose any inquiry. The court's ruling was erroneous. The court should have allowed a trial on the issues, including whether the contract applied to the *Do Right* class action and whether defendants were equitably estopped from claiming the contract was unenforceable due to noncompliance with rule 2-200.

No doubt the court felt that its hands were tied by existing precedent. Indeed, *Chambers, Margolin,* and *Mark* hold that an attorney who willfully or negligently violates rules 2-200 and 3.769 will be denied judicial enforcement of a fee-sharing agreement. These cases serve the important public policy objectives of (1) motivating attorneys to comply with the rules' disclosure and consent requirements and (2) protecting clients from excessive fees and unfavorable litigation tactics. But those objectives are circumvented when one attorney refuses to comply with the rules' disclosure and consent requirements and inequitably blocks the other attorney from doing so. In such a case, the offending attorney is equitably estopped from wielding rule 2-200 as a sword to obtain unjust enrichment. Defendants assert "there is no 'bad guy' exception to" rule 2-200. Under the unique circumstances presented by this case, defendants are wrong.

Because the court awarded defendants $13.5 million in attorney fees as part of the *Do Right* class action settlement, plaintiff requests that we remand the case with instructions allowing it to amend its complaint by adding claims enforcing the fee-sharing agreement. Plaintiff's request to file an amended or supplemental complaint should be addressed to the trial court in the first instance.

## DISPOSITION

The judgment is reversed. Plaintiff shall recover its costs on appeal.

Rylaarsdam, Acting P. J., and Aronson, J., concurred.

A petition for a rehearing was denied January 16, 2013, and the opinion was modified to read as printed above. The petition of respondent McNicholas & McNicholas, LLP, for review by the Supreme Court was denied May 20, 2013, S208294.